COOK *v.* MICHIGAN CENTRAL RAILROAD CO.

1. RAILROADS—DEATH — MASTER AND SERVANT — LIABILITY FOR
    TORTS—NEGLIGENCE.

Where defendant's special officer, empowered to police its
yards and prevent any one from stealing freight or dam-
aging property, to look out for suspicious characters and
to put out persons who were not in the yards on business,
was suddenly seized by two men, who seemed to him to be
a couple of intruders that he had expelled on the previous
day, and who had threatened him with violence, so that
he was excited and lost his head, and shot both assail-
ants, who proved to be acquaintances of the officer, and
not the parties he supposed them to be, the right of de-
cedent to recover for the alleged reckless or negligent
act of the officer of defendant railway company depended
on whether he acted in self-defense only, or in the per-
formance of his duties, having in mind the purpose of
protecting his employer's property.[1]

2. SAME—QUESTIONS FOR A JURY.

It could not be decided, as a matter of law, which intent
actuated the employee in firing upon the persons who as-
saulted him; the question was one of fact and should have
been submitted to the jury.

3. SAME—AUTHORITY TO EJECT—RESPONDEAT SUPERIOR.

Any act done through lack of judgment, discretion, or from
infirmity of temper or under the influence of passion,
somewhat beyond the strict line of the servant's author-
ity, is chargeable to the master, and the law will not un-
dertake to fix with precision the line that distinguishes the
act of the servant from the act of the individual; so that
if in the discharge of his duties the employee lost his head
and exceeded the force that he was authorized to use, the
defendant was liable.

---

[1]On master's civil responsibility for the wrongful or negligent
act of his servant or agent towards one who has no claim upon
the master by reason of a contract incipient or perfected, see
note in 27 L. R. A. 161.

4. Same—Evidence—Witnesses—Servant of Defendant.

A servant and agent of defendant railroad company, called for cross-examination under Act No. 307, Pub. Acts 1909, might be contradicted by the plaintiff, as if defendant had called the witness in its own behalf.

Error to Wayne; Hosmer, J. Submitted April 14, 1915. (Docket No. 31.) Decided December 22, 1915.

Case by Esther M. Cook, as administratrix of the estate of Frank J. Cook, deceased, against the Michigan Central Railroad Company for the unlawful killing of plaintiff's intestate. Judgment for defendant on a directed verdict. Plaintiff brings error. Reversed

*Frederic T. Harward (John J. Gafill, of counsel)*, for appellant.

*J. W. Dohany (Frank E. Robson and Henry Russel, of counsel)*, for appellee.

BIRD, J. In the early evening of August 11, 1911, William Burnett shot and killed Frank J. Cook and Daniel Vreeland in the Michigan Central freightyards in West Detroit. Burnett was a special officer or night watchman for the Michigan Central, and Cook and Vreeland were employed in a like capacity for the Lake Shore & Michigan Southern Railway Company, whose yards lie immediately north of and parallel with the Michigan Central yards, in the vicinity of Junction, Campbell, and Livernois avenues. Cook and Vreeland had entered the Michigan Central yards at Campbell avenue and were crossing them to reach their beats in the Lake Shore yards when the shooting occurred. Burnett's excuse for shooting them was that he mistook them for two suspicious characters whom he had driven out of the yards by force on the previous evening. The wife of Cook, as administratrix of her husband's estate, brought this suit against the Michigan

Central to recover for the negligent killing of her in-testate.

As there were no eyewitnesses of the shooting save Burnett, he was called by plaintiff for cross-examination under Act No. 307, Pub. Acts 1909. At the close of plaintiff's proofs, the trial court directed a verdict for the defendant, on the ground that it had not been made to appear that Burnett was acting within the scope of his employment at the time of the shooting. It was the claim of the defendant that Burnett's act was one purely of self-defense.

1. To determine whether the trial court was wrong in its position, it will be necessary to consider somewhat in detail the material facts attending the shooting, and also the duties and authority of Burnett. Burnett testified that it was his duty "to look after the yard in general to see that no one molested any of the cars, to see that no one took anything out of the yards, except by proper authority, and to see that no suspicious characters whatever were loafing around in the yards, to find out every person's business who seemed to be suspicious in the yard, and, if they had no business in there, to put them out." He further testified that Mr. Dwyer, his senior officer, who hired him, instructed him that he was to be "special officer in the yard, to patrol the yard, to examine the cars to see whether the seals were broken or not, to see that no one broke into the cars and stole things, and to keep characters or people who had nothing to do with the railroad company off the property; yes, and to look after the railroad property in general." Burnett's version of the affair was that, while he was walking between two rows of freight cars about three feet apart, standing on the yard tracks just south of the main line, these two men came out from the end of a car about six inches ahead of him and took hold of him. That one took hold of his neck and one his arm, and

began to tussle with him.   Beyond this he does not make it clear what they attempted to do with him.   He further says that they did not try to strike him, nor did they hurt him, nor did they say anything, except, "We have got you now, old Pal;" that, so far as he knew, they carried no firearms; that he thought they were two men whom he had ejected from the yards in a rough manner the night before at nearly the same place; that without giving them any warning or show whatever, he fired.   He aimed at their hearts and shot to kill.   They were only about three feet away when he fired.   He was armed with an automatic Smith & Wesson revolver, capable of shooting five times.   It was dark, and he could not distinguish faces.   He had met Cook and Vreeland before and knew they were special officers of the Lake Shore.   He admitted that he was rattled and "kind of lost his head."   He claimed he was acting in self-defense.

That the master is liable for the negligence of a servant while acting as such and within the scope of his employment, is a proposition of law that is recognized by both parties.   The variance between counsel arises and the difficulty begins when an attempt is made to apply the rule to the facts of the case.   It is contended by plaintiff that at the moment of the shooting Burnett was acting within the scope of his employment.   Defendant insists that he was not so acting, but was engaged solely in an act of self-preservation.   The test in such cases appears to be:   Did Burnett at the time have in mind the furtherance of his master's business?   If he did, then the master is liable, whether the act was done negligently or recklessly.   If he did not have in mind the furtherance of his master's business, but only his own self-preservation, then the master is not liable. *Sharp* v. *Railroad Co.*, 184 N. Y. 100 (76 N. E. 923, 6 Am. & Eng. Ann. Cas. 250) ; *Layne* v. *Railway Co.*, 66 W. Va. 607 (67 S. E. 1103) ; *Magar* v. *Hammond,*

183 N. Y. 387 (76 N. E. 474, 3 L. R. A. [N. S.] 1038) ; *Fleming* v. *Knitting Mills,* 161 N. C. 436 (77 S. E. 309).

In getting at the viewpoint of Burnett, I think we should assume that the parties killed were the suspicious characters whom he had driven from the yard the previous night. And we must assume that Burnett, in doing what he did was actuated by no malice. He says that certain car seals had been broken and some merchandise taken therefrom, and that he suspected these parties of having done the work, and therefore he forcibly ejected them from the yard. When leaving, they made certain threats against him. They reappeared (as he thought) the second night. They came upon him so suddenly that he had no time to drive them out as he had done on the previous night. He struggled with them for not to exceed 2½ minutes before he fired. During that time did Burnett have in mind to drive them out again, as he had on the previous night? Did he still believe they had evil designs on his master's property? Did he have in mind his duty to his master to care for its property as well as his own self-preservation? And would he have fired on them had it not been for his authority as a special officer and as guardian of his master's property? Or was he unmindful of all these things, and engaged in the struggle solely as an act of self-preservation? These are questions which we cannot answer. They are questions of fact which ought to be determined by a jury. *Sharp* v. *Railroad Co.,* 184 N. Y. 100 (76 N. E. 923, 6 Am. & Eng. Ann. Cas. 250) ; *Layne* v. *Railway,* 66 W. Va. 607 (67 S. E. 1103) ; *Magar* v. *Hammond, supra; Fleming* v. *Knitting Mills,* 161 N. C. 436 (77 S. E. 309) ; *Heenrich* v. *Car Co.* (D. C.), 20 Fed 100; *Redding* v. *Railroad Co.,* 3 S. C. 1 (16 Am. Rep. 681) ; *Winoker* v. *Warfield,* 136 Ga. 742 (71 S. E. 1051) ; *Barden* v. *Felch,* 109 Mass. 154; *Rounds* v.

*Railroad Co.,* 64 N. Y. 129 (21 Am. Rep. 597); 1 Thompson on Negligence, § 615; *Bouwmeester* v. *Railroad Co.,* 67 Mich. 87 (34 N. W. 414). The testimony was such that the jury might have found either way, that he did or did not have in view his master's business.

Much reliance is placed by defendant upon the case of *Holler* v. *Ross,* 68 N. J. Law, 324 (53 Atl. 472, 59 L. R. A. 943, 96 Am. St. Rep. 546), which is somewhat similar on the facts, to show that the question of the master's liability was one for the court, and not for the jury. The principal difference in the facts of that case and the present one is that the servant in the case cited had no authority to drive any one from the dock. The dock did not belong to his master. The servant's only duty was to guard his master's property located upon the dock by permission. In the present case the yards were owned by the master, and Burnett had been authorized to eject certain classes of persons therefrom. These facts in the case cited sustaining the distinction evidently had much weight with Mr. Justice Fort in reaching the conclusion which he did, that it was a question for the court, as he mentions them and comments thereon. One of his associates, Mr. Justice Pitney, dissented. But, even if the present case cannot be distinguished on the facts from the case cited, I am of the view that the facts in the latter one should have been submitted to the jury under the reasoning of the cases heretofore cited.

2. But it is contended that Burnett exceeded his authority given him by the defendant, and that in shooting the men he was acting in pursuance of some purpose of his own. It appears from the testimony that Burnett was placed in the yards and instructed to do certain things, namely, to put stragglers, suspicious persons, and persons having no business with the company out of the yards. He was authorized to eject such

people from the yards, but no instruction was given him as to how much force he should use or in what way he should use it. Much was left to his discretion to decide when and under what circumstances persons were to be ejected and how and in what manner they were to be ejected. Under such authority, if in the discharge of his duty he "kind of lost his head" and went further and used more force than he was authorized to use, the master is liable. *Rounds* v. *Railroad Co.*, 64 N. Y. 129 (21 Am. Rep. 597) ; *Howe* v. *Newmarch*, 12 Allen (Mass.), 49; *Robards* v. *Pipe Co.*, 130 Ky. 380 (113 S. W. 429, 18 L. R. A. [N. S.] 923, 132 Am. St. Rep. 394).

In the last-mentioned case the rule was stated to be that:

"The master who puts the servant in the place of trust or responsibility, or commits to him the management of his business or the care of his property, is justly held responsible when the servant, through lack of judgment or discretion, or from infirmity of temper, or under the influence of passion aroused by the circumstances and the occasion, goes beyond the strict line of his duty or authority, and inflicts an unjustifiable injury upon another."

It was further said in this connection that:

"Furthermore, the law, under such circumstances, will not undertake to make any nice distinctions fixing with precision the line that separates the act of the servant from the act of the individual. When there is doubt, it will be resolved against the master, upon the ground that he set in motion the servant who committed the wrong.'

See, also, *South Covington, etc., R. Co.* v. *Cleveland*, 100 S. W. 283, 30 Ky. Law Rep. 1072, 11 L. R. A. (N. S.) 853; *New Ellerslie Fishing Club* v. *Stewart*, 123 Ky. 8 (93 S. W. 598, 9 L. R. A. [N. S.] 475; 1 Thompson on Negligence, §§ 554-563.

3. We think plaintiff was entitled to contradict the witness Burnett, either by himself, or by other witnesses. Act No. 307, Pub. Acts 1909, gives the party calling the witness the same rights in that respect as it would had defendant called the witness in its behalf.

In view of the conclusions reached, the judgment must be reversed, and a new trial ordered.

STONE, MOORE, and STEERE, JJ., concurred with BIRD, J.

BROOKE, C. J., and KUHN and OSTRANDER, JJ., concurred in the result.

The late Justice MCALVAY took no part in this decision.