BRYANT v BRANNEN

Docket No. 111708. Submitted September 20, 1988, at Lansing. Decided September 5, 1989. Leave to appeal applied for.

Dale A. Bryant, Sr., a tenant in an apartment building in which numerous criminal activities had occurred, including a prior shooting, drug dealing, and breakings and enterings, was shot by Gene Blakely, the apartment manager, who lived directly across the hall from Bryant. At the time of the shooting, the individuals were standing in their respective apartments. Bryant was paralyzed from the chest down as a result of the shooting and eventually his legs were amputated. The two men had gotten into an argument concerning Bryant's alleged tampering with a fire escape door. Bryant testified that he had retreated into his apartment and had returned to close the door to his apartment when he was shot. Blakely told the police that Bryant had threatened him and then gone into his apartment. Blakely thought Bryant went after a weapon and he got a rifle and shot Bryant. Blakely reported the incident and turned himself in to the police. He later fled the jurisdiction. Bryant and others filed suit against C. J. Brannen, the owner of the apartment building, and Blakely in Wayne Circuit Court, claiming, inter alia, that Brannen should have provided security guards to protect Bryant from the assault by Blakely and that Brannen, Blakely's employer, was liable for Blakely's assault under the doctrine of respondeat superior. Witnesses testifying on behalf of Brannen stated that Blakely was fixing the fire escape door and told Bryant not to remove the lock on the door and that Bryant then threatened to kill Blakely and returned with a pistol in his hand. Blakely then shot Bryant. Brannen testified that he did not know that Blakely had a rifle and there was no evidence that Blakely was authorized to carry a rifle or had carried a rifle while performing his duties. Blakely's rifle was the only weapon recovered by the police.

REFERENCES

Am Jur 2d, Landlord and Tenant §§ 805 *et seq.*; Master and Servant §§ 404 *et seq.*

Landlord's liability for injury or death due to defects in areas of building (other than stairways) used in common by tenants. 65 ALR3d 14.

The trial court, Susan D. Borman, J., denied Brannen's motion for a directed verdict, and the jury returned a verdict in favor of plaintiffs, finding that Brannen was negligent in failing to provide security guards and that Blakely was acting within the scope of his employment when he assaulted Bryant. The court denied Brannen's subsequent motions for remittitur, a judgment notwithstanding the verdict, or a new trial. Brannen appealed. The Court of Appeals, in an unpublished opinion per curiam, affirmed the trial court's decision. Brannen sought leave to appeal to the Supreme Court, which, in lieu of granting leave to appeal, remanded the case to the Court of Appeals for reconsideration in light of *Williams v Cunningham Drug Stores, Inc,* 429 Mich 495 (1988). 431 Mich 864 (1988).

On remand, the Court of Appeals *held:*

1. Blakely shot Bryant while they were in their respective apartments. Thus, a common area under Brannen's control was involved only to the extent that a bullet flew through the common hallway. Given this fact, Brannen had no duty to provide security guards to protect Bryant from the assault by Blakely. A landlord may be liable for foreseeable criminal acts which are facilitated by his failure to keep the physical premises under his control, i.e., common areas, reasonably safe or in good repair, but has no duty to provide the tenants police protection from the foreseeable criminal acts of other tenants. To hold otherwise would shift the duty of police protection from the government to the private sector, which would amount to advocating that members of the public resort to self-help, and that would contravene public policy.

2. Blakely was not acting within the scope of his employment as a matter of law when he used deadly force upon Bryant, therefore Brannen is not liable under the theory of respondeat superior.

3. The circuit court's denial of Brannen's motion for a directed verdict is reversed.

Reversed.

Holbrook, Jr., P.J., dissented. He would hold that Bryant presented a viable theory of recovery supported by sufficient proofs to support the verdict of the jury and that the trial court correctly denied Brannen's motion for a directed verdict on the issue whether Brannen had a duty to take additional security measures, such as providing trained security personnel, to protect tenants from the criminal activities of third parties, regardless of whether those third parties were other tenants or intruders. He would also hold that Brannen's liability under a theory of respondeat superior for an employee's intentional tort presented a jury question able to withstand a motion for a

directed verdict. He would affirm the circuit court's denial of Brannen's motion for a directed verdict.

1. LANDLORD AND TENANT — CRIMINAL ACTS — POLICE PROTECTION.

A landlord may be liable for foreseeable criminal acts which are facilitated by his failure to keep the physical premises under his control, i.e., common areas, reasonably safe or in good repair, but he has no duty to provide tenants with police protection from the foreseeable criminal acts of other tenants.

2. MASTER AND SERVANT — TORTS — RESPONDEAT SUPERIOR.

An employer is liable for the intentional tort of his employee if the tort is committed in the course and within the scope of the employee's employment; if the employee does the act while engaged in the employer's work but is without authority to do so, the employer is not liable.

3. MASTER AND SERVANT — CRIMINAL ACTS — SCOPE OF EMPLOYMENT.

An act may be within the scope of employment although consciously criminal or tortious; the fact that the employee intends a crime, especially if the crime is of some magnitude, is considered in determining whether or not the act is within the employment, since the employer is not responsible for acts which are clearly inappropriate to or unforeseeable in the accomplishment of the authorized result; the employer can reasonably anticipate that employees may commit minor crimes in the prosecution of the business, but serious crimes are not only unexpected but in general are in nature different from what employees in a lawful occupation are expected to do.

4. MASTER AND SERVANT — TORTS — RESPONDEAT SUPERIOR — LANDLORD AND TENANT.

The owner of an apartment building is not liable under a theory of respondeat superior for the shooting of one of his tenants by his building manager and fellow tenant of the victim where the shooting was not an act within the scope of the building manager's employment.

*Becker & Van Cleef, P.C.* (by *Frank G. Becker*), for plaintiffs.

*Berkley, Rudick & Chernikov* (by *Stuart M. Rudick*), for defendant.

Before: HOLBROOK, JR., P.J., and GILLIS and GRIBBS, JJ.

Gillis, J. Plaintiff Dale A. Bryant, Sr., (hereinafter plaintiff), testified that on Sunday evening, May 30, 1982, he was working on his own door while standing in his apartment. Plaintiff was making noise and defendant Blakely, the apartment manager, who lived directly across the hall from plaintiff, opened his apartment door and said: "Don't mess with that door." Plaintiff asked: "What door?" Blakely repeated: "Don't mess with that door." Plaintiff believed that Blakely was talking about the fire escape door, which was locked and boarded up. Plaintiff continued to work on his own door. Blakely then said: "I'm not scared of you." Plaintiff did not know what Blakely was talking about. Blakely then said: "Wait a minute." Blakely then went into his apartment and returned to his doorway with a rifle at his side. Plaintiff retreated into his apartment, but realized that he had left the door open. When plaintiff went to close the door he was shot *in his own apartment's hallway* which led to the door. Plaintiff was paralyzed from the chest down and eventually his legs were amputated.

Plaintiff testified:

> I don't think the guy [Blakely] was in his right mind. I don't think he was sober. I think he was drunk or high . . . . I haven't [sic] provoked the guy before.

Plaintiff denied having a gun.

Plaintiff also testified that numerous criminal activities had occurred in the building, including a prior shooting, drug dealing, and breakings and enterings.

Two unidentified witnesses carried plaintiff into his living room after the shooting. Only Blakely's rifle was recovered by the police.

Blakely told police that he was nailing the fire escape door closed and that plaintiff kept removing the nails. They got into an argument. Plaintiff threatened Blakely and then plaintiff went into his apartment. Fearing plaintiff was retrieving a weapon, Blakely got his rifle and shot plaintiff. The officers testified that Blakely did not appear intoxicated. While Blakely reported the incident and later turned himself in, he subsequently fled the jurisdiction.

On the other hand, defendant-appellant Brannen's witnesses testified that Blakely was fixing the fire escape door and told plaintiff not to remove the lock thereon. Plaintiff then threatened to kill Blakely. Plaintiff returned with a pistol in his hand and Blakely shot plaintiff.

Defendant Brannen (hereinafter defendant), the apartment building owner, testified that Blakely was a handyman and noted that many tenants, including plaintiff and his wife, had performed tasks in the building for pay. Defendant did not know that Blakely had a rifle and there was no evidence that Blakely was authorized to carry a rifle or had carried a rifle while performing his duties.

Plaintiff sued defendant, claiming that he should have provided security guards to protect plaintiff from the assault by Blakely, defendant's employee and plaintiff's fellow tenant, and that defendant was liable for Blakely's assault under the doctrine of respondeat superior.

The trial court denied defendant's motion for a directed verdict on these theories. The jury returned a verdict in favor of plaintiff for $2,500,000, finding that defendant was negligent in failing to provide security guards and that Blakely was acting within the scope of his employment when he assaulted plaintiff. The jury awarded plaintiff's

wife $12,500 and his son $50,000. The trial court denied defendant's subsequent motions for remittitur, a judgment notwithstanding the verdict, or a new trial.

Defendant then appealed as of right, claiming the trial court should have granted his motion for a directed verdict. This Court affirmed. *Bryant v Brannen,* unpublished opinion per curiam of the Court of Appeals, decided February 19, 1988 (Docket No. 93843). Defendant then appealed to our Supreme Court, which remanded for reconsideration in light of *Williams v Cunningham Drug Stores, Inc,* 429 Mich 495; 418 NW2d 381 (1988). *Bryant v Brannen,* 431 Mich 864; 428 NW2d 346 (1988). In its order, our Supreme Court stated:

> This order should not be understood as precluding reconsideration of the issue involving the doctrine of respondeat superior should the Court of Appeals desire to do so. [*Id.* at 864-865.]

In reviewing the trial court's denial of a motion for a directed verdict, this Court examines the testimony and all legitimate inferences that may be drawn therefrom in the light most favorable to the nonmoving party. *Butt v Giammariner,* 173 Mich App 319, 323; 433 NW2d 360 (1988). If there are material issues of fact upon which reasonable minds could differ, the matter is properly submitted to the jury. *Id.*

Plaintiff's first theory of recovery was that defendant as a landlord had a duty to provide security guards to protect plaintiff from the assault by Blakely, plaintiff's fellow tenant and defendant's employee.

In *Johnston v Harris,* 387 Mich 569; 198 NW2d 409 (1972), our Supreme Court held that the defendant landlord was not entitled to a directed verdict

where the tenant plaintiff presented evidence that he was robbed and assaulted by a youth who was lurking in the poorly lit, unlocked vestibule of the defendant's apartment building. The plaintiff presented expert testimony linking poor lighting and night crime. The Court ruled that, while an intentional crime is a superseding cause of harm where a person's negligence created a situation which afforded a third person the opportunity to commit the crime, such a crime is not a superseding cause of the plaintiff's harm if the negligent actor at the time of his conduct realized or should have realized the likelihood that such a situation might be created and that a third person might avail himself of the opportunity to commit such a crime. *Id.* at 574 (quoting 2 Restatement Torts, 2d, § 448, p 480).

Justice T. E. BRENNAN dissented, noting:

> Public safety is the business of government.
>
> Today's decision concedes the failure of government to make the streets and homes of certain areas reasonably safe and, in effect, transfers the governmental function of public protection to the unfortunate owners of real property in such places.
>
> Already overburdened by taxes largely laid to pay for public safety, these owners will now be required to maintain additional lighting, guards, enclosures, alarms, locks and take every other precaution to avoid reasonably foreseeable conditions which attract criminals to carry out their nefarious deeds. [*Id.* at 576.]

In *Samson v Saginaw Professional Building, Inc,* 393 Mich 393; 224 NW2d 843 (1975), the plaintiff worked for a lawyer who leased an office on the fifth floor of the defendant's building. The Saginaw Mental Health Clinic also leased space in the

defendant's building, but on the fourth floor. The clinic treated mental health patients, including those from Traverse City State Hospital and from Ionia State Prison. Tenants in the defendant's building told defendant's representatives that they were afraid of the clinic's patients, who had to use the stairs and elevators to reach the clinic. The defendant took no action. The plaintiff was attacked by one of the clinic's patients in an elevator.

Our Supreme Court held:

> *Whether or not the landlord retains any responsibility for actions which occur within the confines of the now leased premises is not now before this Court and need not be answered. It would appear, however, that he would not retain any responsibility for such actions except in the most unusual circumstances.* However, the landlord has retained his responsibility for the common areas of the building which are not leased to his tenants. The common areas such as the halls, lobby, stairs, elevators, etc., are leased to no individual tenant and remain the responsibility of the landlord. It is his responsibility to insure that these areas are kept in good repair and reasonably safe for the use of his tenants and invitees.
>
> The existence of this relationship between the defendant and its tenants and invitees placed a duty upon the landlord to protect them from unreasonable risk of physical harm. [*Id.* at 407. Emphasis supplied.]

In an addendum to its opinion, our Supreme Court noted the following reasonable actions which the defendant could have taken:

> An ordinarily prudent person might have rented to the state only office space on the first floor so that mental patients would have no need to use elevators, stairwells, or other common areas of the

building. He might have placed a guard on the elevators to protect people lawfully using them. [*Id.* at 410.]

Justice LEVIN, dissenting, noted that the defendant's building contained no unremedied physical defects in the common areas which would allow the clinic's patients to commit a crime. *Samson, supra* at 414-415, 420-421. Two other justices agreed.

Then, in *Williams, supra,* our Supreme Court held that a merchant's duty of reasonable care does not include providing armed, visible security guards to deter criminal acts of third parties. In *Williams,* the plaintiff was a store patron. The defendant store was robbed and the plaintiff inadvertently ran out behind the robber, who shot him. Our Supreme Court noted that owners and occupiers of land are in a special relationship with their invitees and have a duty to exercise reasonable care to protect invitees from an unreasonable risk of harm caused by a dangerous condition of the land. *Id.* at 499. Consequently, a landlord may be held liable for an unreasonable risk of harm caused by a dangerous condition in the areas of common use retained in his control such as lobbies, elevators, hallways, and stairways. *Id.* Likewise a business invitor or merchant may be held liable for injuries resulting from negligent maintenance of the premises or defects in the physical structure of the building. *Id.* at 499-500. Nonetheless, the invitor is not a guarantor of the invitees' safety; his only duty is to exercise reasonable care for their protection. *Id.* at 500.

Our Supreme Court declined to extend the duty to provide armed security guards to merchants given the degree of control in a merchant's relationship with invitees, the nature of the harm

involved, and the public interest in imposing such a duty. The Court noted that the plaintiff was essentially arguing that the defendant had a duty to provide police protection, which was vested in the government. The Court also noted that, while the defendant could control the condition of its premises by correcting physical defects which might result in injury to its invitees, it could not control the incidence of crime in the community. In particular, our Supreme Court noted that businesses are open to the public.

The Supreme Court then added the following footnote:

> We find that a landlord has more control in his relationship with his tenants than does a merchant in his relationship with his invitees. Should a dangerous condition exist in the common areas of a building which tenants must necessarily use, the tenants can voice their complaints to the landlord. Thus, in *Samson v Saginaw Professional Building, Inc,* 393 Mich 393, 408-411; 224 NW2d 843 (1975), we upheld a landlord's duty to investigate and take available preventive measures when informed by his tenants that a possible dangerous condition exists in the common areas of the building, noting that the landlord's duty may be slight. The relationship between a merchant and invitee, however, is distinguishable because the merchant does not have the same degree of control. When the dangerous condition to be guarded against is crime in the surrounding neighborhood, as it is in the present case, the merchant may be the target as often as his invitees. Therefore, there is little the merchant can do to remedy the situation, short of closing his business. [*Id.* at 502, n 17.]

Nonetheless, the Supreme Court approvingly cited *Goldberg v Newark Housing Authority,* 38 NJ 578, 589-590; 186 A2d 291 (1962), which held that a municipal housing authority did not have a duty

to provide police protection for its tenants. *Id.* at 503.

Finally, our Supreme Court noted that the inability of government and law enforcement officials to prevent criminal attacks did not justify shifting that responsibility to the business owner. *Id.* at 503. In fact, to shift the duty of police protection from the government to the private sector would amount to advocating that members of the public resort to self-help, and that would contravene public policy. *Id.* at 503-504.

As noted above, our Supreme Court remanded this case for reconsideration in light of *Williams, supra.* Nonetheless, we begin our analysis by noting that Blakely shot plaintiff while they were in their respective apartments. Hence, a common area under the landlord's control was involved only to the extent that a bullet flew through the common hallway. Given this fact, we believe that defendant did not have any liability at all. See and compare *Williams, supra* at 499; *Samson, supra* at 407; *Johnston, supra.*

Even assuming that the argument and shooting would have occurred in the hallway and a security guard would have broken up the argument or taken Blakely's weapon from his apartment, we find *Williams'* public policy rationale persuasive despite the existence of footnote 17 in that opinion. To the extent that *Samson* suggested the landlord might hire a guard to protect tenants from the foreseeable criminal acts of another tenant's invitee, we believe that it was implicitly overruled by *Williams.* To hold otherwise would shift to the landlord the duty of providing private police protection. Nonetheless, we believe that a landlord remains liable to the extent that foreseeable criminal acts are facilitated by his failure to keep the physical premises under his control rea-

sonably safe (e.g., poor locks) or in good repair (e.g., broken locks). See *Johnston, supra.* Such allegations were not made in this case.

Furthermore, we note that this assault occurred between tenants rather than between a tenant and an unknown or known criminal assailant. Certainly a security guard would generally be hired to protect tenants from outsiders rather than other tenants or the landlord's employees. See *Morgan v Dalton Management Co,* 117 Ill App 3d 815, 819; 454 NE2d 57, 61 (1983). In any event, plaintiff testified that he had no prior problems with Blakely and defendant testified that tenants who were drinking might get in squabbles and call the police to quell their disputes.

We now turn to the issue of whether defendant is liable under the theory of respondeat superior.

An employer is liable for the intentional tort of his employee if the tort is committed in the course and within the scope of the employee's employment. *Burch v A & G Associates, Inc,* 122 Mich App 798, 804; 333 NW2d 140 (1983), lv den 418 Mich 928 (1984). An employer is not liable, however, if the employee does the act while engaged in the employer's work, but outside of his authority. *Id.* For example, an employee may act to gratify some personal animosity or to accomplish some purpose of his own. *Id.* While the issue of whether the employee was acting within the scope of his employment is generally for the trier of fact, the issue may be decided as a matter of law where it is clear that the employee was acting to accomplish some purpose of his own. *Id.* at 805.

In *Burch,* the plaintiff was robbed and assaulted by a taxicab driver after having paid his fare. This Court held there was no basis upon which a jury could find that the employee was furthering his master's business.

*Burch* relied on *Martin v Jones,* 302 Mich 355; 4 NW2d 686 (1942), in reaching its conclusion. In *Martin,* the plaintiff had an argument with a gasoline station manager concerning, among other things, the fact that the manager had improperly placed bulk oil in the plaintiff's vehicle. As the argument continued, the manager shot the plaintiff with a gun. The jury found for the plaintiff and the trial court granted the employer's motion for a judgment notwithstanding the verdict, ruling in part that the shooting was a deliberate act and did not arise out of the course of the manager's employment. Our Supreme Court affirmed, holding that the manager had not shot to protect his employer's property, that the shooting did not further the employer's business in any way, and that it was not one of the manager's duties to be armed. While noting that the argument arose over the sale of oil, part of the manager's duties, our Supreme Court held that the shooting did not further the employer's business. The Court stressed that in cases holding an employer liable for the acts of his servant, the employee could in some way have been held to have been promoting his master's business or else the employee's duties included the duty of carrying a firearm.

1 Restatement Agency, 2d, § 229, p 506, provides:

> (1) To be within the scope of the employment, conduct must be of the same general nature as that authorized, or incidental to the conduct authorized.
>
> (2) In determining whether or not the conduct, although not authorized, is nevertheless so similar to or incidental to the conduct authorized as to be within the scope of employment, the following matters of fact are to be considered:

(a) whether or not the act is one commonly done by such servants;

(b) the time, place and purpose of the act;

(c) the previous relations between the master and the servant;

(d) the extent to which the business of the master is apportioned between different servants;

(e) whether or not the act is outside the enterprise of the master or, if within the enterprise, has not been entrusted to any servant;

(f) whether or not the master has reason to expect that such an act will be done;

(g) the similarity in quality of the act done to the act authorized;

(h) whether or not the instrumentality by which the harm is done has been furnished by the master to the servant;

(i) the extent of departure from the normal method of accomplishing an authorized result; and

(j) whether or not the act is seriously criminal.

All these factors are used to determine whether it is just that the loss resulting from the servant's act should be considered one of the normal risks to be borne by the business in which the servant is employed. Comment f to this section provides that the fact that the act done is a serious crime is a factor indicating that it is not in the scope of employment.

1 Restatement Agency, 2d, § 231, p 512, provides:

An act may be within the scope of employment although consciously criminal or tortious.

However, part of comment a to that section explains:

The fact *that the servant intends a crime, especially if the crime is of some magnitude, is consid-*

*ered in determining whether or not the act is within the employment, since the master is not responsible for acts which are clearly inappropriate to or unforeseeable in the accomplishment of the authorized result.* The master can reasonably anticipate that servants may commit minor crimes in the prosecution of the business, but *serious crimes are not only unexpectable but in general are in nature different from what servants in a lawful occupation are expected to do.*

A chauffeur, driving on an errand for his master, who knowingly drives on the left-hand side of the street or exceeds the speed limit, is still acting within the scope of employment. Likewise, a gardener using a small stick in an assault upon a trespassing child to exclude him from the premises may be found to be acting within the scope of the employment; if, however, the gardener were to shoot the child for the same purpose, it would be difficult to find the act within the scope of employment. So, if a servant is directed to use any lawful means to overcome competition, the bribery of employees of the competitor, or the circulation of malicious stories, might be found to be within the scope of employment, while the murder of the competitor, although actuated solely by zeal for the master, would not be. [Emphasis supplied.]

1 Restatement Agency, 2d, § 235, p 520, provides:

An act of a servant is not within the scope of employment if it is done with no intention to perform it as a part of or incident to a service on account of which he is employed.

Comment c to that section provides:

*The fact that an act is done in an outrageous or abnormal manner has value in indicating that the servant is not actuated by an intent to perform the employer's business.* [Emphasis supplied.]

The illustration to that comment explains:

> A is employed to eject trespassers. A boy of four seeks to enter the premises. A could easily prevent the child from so doing by calling to him. Instead, he shoots at the child and kills him. This evidence indicates that A was not actuated by an intent to perform his master's business and hence that his act was not within the scope of his employment.

See *Perez v Zazo,* 498 So 2d 463 (Fla App, 1986), where the court held that the defendant landlord's motion for a directed verdict should have been granted when the building's manager stabbed a tenant three times after the tenant asked to have the hot water turned on, a chronic complaint. The court did not see how any purpose of the landlord was furthered by attempting to eliminate the tenant. See also *Wellman v Pacer Oil Co,* 504 SW2d 55 (Mo, 1973), where the court held that a gasoline station attendant who shot a patron during a dispute over damage allegedly done to the patron's car was not acting within the scope of his employment as a matter of law because his actions were so outrageous, criminal, and excessively violent.

Having reviewed this state's cases, we believe them to be in line with the principles contained in the above-quoted passages in the Restatement Agency, 2d. Michigan cases have imposed liability on employers whose servants committed simple batteries while repossessing property, collecting money from a patron, or ejecting a patron from a bar. *Stewart v Napuche,* 334 Mich 76; 53 NW2d 676 (1952); *Guipe v Jones,* 320 Mich 1; 30 NW2d 408 (1948); *Moffit v White Sewing Machine Co,* 214 Mich 496; 183 NW 198 (1921); *Zart v Singer Sewing Machine Co,* 162 Mich 387; 127 NW 272 (1910). Hence, when an employee commits a minor crime,

a jury question arises as to whether that employee was acting within the scope of his employment.

Our Supreme Court has also held that where a night watchman, who carried a revolver, killed someone he believed was going to do damage to his employer's property, it was for the jury to determine whether he was acting in the scope of his employment. *Cook v Michigan Central R Co,* 189 Mich 456; 155 NW 541 (1915). Thus, when an employee commits a serious crime involving excessive violence, his action is unexpectable unless that employee is expected to use such force in the normal course of his duties, such as when the employee is authorized by his employer to carry a weapon. Compare *Cook, supra,* where a jury question was raised because the employee was a night watchman who carried a weapon in the course of his duties, with *Martin, supra,* where as a matter of law the employer was held not vicariously liable for the shooting committed by a gasoline station manager whose duties did not include carrying a firearm. Consequently, when an employee commits a serious crime involving excessive violence, the court should hold as a matter of law that that employee was not acting within the scope of his employment unless the previously discussed exceptions apply.

In this case, viewing the facts in the light most favorable to the plaintiffs, Blakely was the manager of defendant's building and, therefore, had the authority to use reasonable force to protect defendant's property. See, e.g., *People v Doud,* 223 Mich 120, 129-131; 193 NW 884 (1923). However, Blakely shot plaintiff after an argument concerning plaintiff's alleged prior tampering with a fire escape door. We note that, although plaintiff claimed that he was working on his own apartment door just before the shooting, he acknowl-

edged that the dispute was over the fire escape
door. Thus, Blakely, who did not carry a weapon
in the normal course of his duties and was not
authorized to carry a weapon by defendant, shot
plaintiff even though plaintiff was not tampering
with the fire escape door. Compare *Cook, supra,*
where the employee was a night watchman who
carried a weapon in the course of his duties. Even
assuming that shooting plaintiff would have pre-
vented his ability to tamper with the fire escape
door in the future, we hold that Blakely was not
acting within the scope of his employment as a
matter of law when he used deadly force upon
plaintiff. Again, such a serious crime is unexpecta-
ble where defendant, as the employer, had no
reason to foresee Blakely's action because Blakely
did not carry a weapon in the course of his duties
and he was not explicitly or implicitly authorized
to carry a weapon. Moreover, even assuming that
Blakely shot plaintiff for working on his own
apartment door, we likewise hold that Blakely was
not acting within the scope of his employment as a
matter of law when he used deadly force upon
plaintiff. We note that plaintiff withdrew his alle-
gation that defendant had negligently hired
Blakely.

Hence, we reverse the circuit court's denial of
defendant's motion for a directed verdict.

Reversed.

Gribbs, J., concurred.

Holbrook, Jr., P.J. *(dissenting).* This appeal is
before us on remand from an order of the Supreme
Court, *Bryant v Brannen,* 431 Mich 864; 428
NW2d 346 (1988), vacating our previous unpub-
lished opinion per curiam, decided February 19,
1988 (Docket No. 93843), in which we affirmed a

judgment for injuries sustained from a gunshot inflicted by an employee of defendant. Having reconsidered this case pursuant to the remand direction, I would again affirm.

In our earlier decision, we concluded that the trial court correctly denied a motion for a directed verdict, holding that the evidence raised a jury question as to "whether defendant had a duty to take additional security measures, such as providing trained security personnel, to protect tenants from the criminal activities of third parties, [regardless of] whether those third parties were other tenants or intruders." In its remand, the Supreme Court directed that we consider its decision in *Williams v Cunningham Drug Stores, Inc,* 429 Mich 495; 418 NW2d 381 (1988). In *Williams,* it was held "as a matter of law that the duty of reasonable care a merchant owes his invitees does not extend to providing armed, visible security guards to protect customers from the criminal acts of third parties." *Id.,* p 504. "[F]or reasons of public policy [the merchant] does not have the responsibility for providing police protection on his premises." *Id.*

I begin with the unremarkable observation that *Williams* is factually distinguishable from the instant case. *Williams* involved a suit by a customer against a business invitor for a third-party assault committed on the latter's premises. This case is a suit by a residential tenant against a landlord for an assault committed by a person who was both a tenant and an employee of the landlord. Thus, if *Williams* is understood to compel a different result than that effected by our earlier decision, it is by extension of its analogous principles to the tenant-landlord context. The underlying distinction is acknowledged by the *Williams* Court:

"We find that a landlord has more control in his relationship with his tenants than does a merchant in his relationship with his invitees. Should a dangerous condition exist in the common areas of a building which tenants must necessarily use, the tenants can voice their complaints to the landlord. Thus, in *Samson v Saginaw Professional Building, Inc,* 393 Mich 393, 408-411; 224 NW2d 843 (1975), we upheld a landlord's duty to investigate and take available preventive measures when informed by his tenants that a possible dangerous condition exists in the common areas of the building, noting that the landlord's duty may be slight. The relationship between a merchant and invitee, however, is distinguishable because the merchant does not have the same degree of control. When the dangerous condition to be guarded against is crime in the surrounding neighborhood, as it is in the present case, the merchant may be the target as often as his invitees. Therefore, there is little the merchant can do to remedy the situation, short of closing his business." [*Id.,* p 502, n 17.]

In *Samson, supra,* the Court held that a landlord of an office building owes a duty to insure that common areas are reasonably safe for tenants and their invitees. This duty was held to encompass the possibility of a criminal assault to the extent that it posed a foreseeable danger carrying an unreasonable risk of harm. Whether or not the landlord is negligent in anticipating and taking precautions against criminal assaults is a question for the jury.

Similarly, in *Johnston v Harris,* 387 Mich 569; 198 NW2d 409 (1972), the Court, in reversing a directed verdict for the defendant landlord, held that the plaintiff's proofs on a theory of inadequate lighting and unlocked doors were sufficient for a jury to decide whether the defendant's omissions breached his duty of reasonable care to protect tenants from foreseeable risks. See also

*Aisner v Lafayette Towers*, 129 Mich App 642; 341 NW2d 852 (1983), lv den 419 Mich 871 (1984).

The holdings in *Samson* and *Johnston* indicate that plaintiffs in this case presented a viable theory of recovery supported by sufficient proofs to support the verdict of the jury.[1] I see no reason to hold that *Williams* implicitly overruled *Samson* and *Johnston*. Because the policy concerns underlying *Williams* are not applicable with the same force in the context of a residential tenancy and because a landlord retains greater control over an apartment building than does the merchant defendant in *Williams*, it is unnecessary to extend *Williams* this far. Although the Court in *Williams* cited *Goldberg v Newark Housing Authority*, 38 NJ 578; 186 A2d 291 (1962), where it was held that a municipal landlord has no duty to provide police protection to a large housing project, I do not believe that our Supreme Court thereby intended to intimate that *Samson* was suspect in principle. Rather the citation to *Goldberg* appears to be supportive of the limited proposition that a duty on merchants to provide security guards for their customers would be unfairly vague in specific application. *Williams, supra,* pp 502-503.

In our previous decision, we also held that defendant's liability under a theory of respondeat supe-

---

[1] The majority observes enigmatically:

Nonetheless, we begin our analysis by noting that Blakely shot plaintiff while they were in their respective apartments. Hence, a common area under the landlord's control was involved only to the extent that a bullet flew through the common hallway. Given this fact, we believe that defendant did not have any liability at all.

Insofar as the legal relationship between a tenant and a landlord is concerned, the foregoing observation would not appear to affect the application of principles of premises liability. In a situation where a tenant is fired upon from outside his apartment unit, as the extension of a dispute in an open doorway to a common area, the relative placement of tenant and assailant has little relevance to controlling negligence concepts, e.g., duty, standard of care, proximate causation.

rior for an employee's intentional tort presented a jury question able to withstand a motion for a directed verdict. Essential to this holding was evidence that the employee, a handyman regarded by at least some tenants as the building manager, shot plaintiff Dale Bryant for perceived tampering with a lock on a door to a common area of the apartment building. The remand order of the Supreme Court indicates that it "should not be understood as precluding reconsideration of the issue involving the doctrine of respondeat superior should the Court of Appeals desire to do so." 431 Mich 864-865. Upon reconsideration, I am not persuaded that our previous decision should be disturbed.

Although an employee's intentional tort generally does not give rise to the employer's vicarious liability, liability will attach if the commission of the tortious act occurred in the course and within the scope of employment. *Burch v A & G Associates, Inc*, 122 Mich App 798, 804; 333 NW2d 140 (1983), lv den 418 Mich 928 (1984). Thus, the employer is not liable if the tort is committed to gratify some purely personal desire. *Martin v Jones*, 302 Mich 355; 4 NW2d 686 (1942). However, a jury question is presented as to vicarious liability if there is evidence indicating that the employee acted to further the employer's interests, *Moffit v White Sewing Machine Co*, 214 Mich 496, 500; 183 NW 198 (1921) (assault allegedly perpetrated in effort to coerce payment of bill owed to employer), or to protect the employer's property, *Cook v Michigan Central R Co*, 189 Mich 456; 155 NW 541 (1915) (intruders shot by night watchman in the course of guarding railroad property). The evidence in this case presented a jury question.

Plaintiff's assailant, allegedly acting in overzealous furtherance of defendant's interests, exercised

more violence than defendant would undoubtedly
have preferred, at least after the fact. Neverthe-
less, that defendant might not have approved or
ratified such specific conduct will not necessarily
serve to excuse him from vicarious liability. In
*Cook, supra,* p 462, the Court noted:

> Under such authority, if in the discharge of his
> duty [the employee] "kind of lost his head" and
> went further and used more force than he was
> authorized to use, the master is liable. . . . *Ro-
> bards v [P Bannon Sewer] Pipe Co,* 130 Ky 380
> (113 SW 429; 18 LRA [NS] 923; 132 Am St Rep 394
> [1908]).
>
> In the last-mentioned case the rule was stated to
> be that:
>
> "The master who puts the servant in the place
> of trust or responsibility, or commits to him the
> management of his business or the care of his
> property, is justly held responsible when the ser-
> vant, through lack of judgment or discretion, or
> from infirmity of temper, or under the influence of
> passion aroused by the circumstances and the
> occasion, goes beyond the strict line of his duty or
> authority, and inflicts an unjustifiable injury upon
> another."
>
> It was further said in this connection that:
>
> "Furthermore, the law, under such circum-
> stances, will not undertake to make any nice
> distinctions fixing with precision the line that
> separates the act of the servant from the act of the
> individual. When there is doubt, it will be resolved
> against the master, upon the ground that he set in
> motion the servant who committed the wrong."

Thus, our earlier conclusion that the employee
"although perhaps intemperate and exercising
poor judgment, was acting in his employer's inter-
est when he sought to prevent tampering with the
lock and, thereafter, shot Dale Bryant" appears,
upon further consideration, to be a correct applica-

tion of the law. In reaching a contrary conclusion, the majority places much emphasis on the excessive violence of the employee's response to perceived wrongdoing by plaintiff and the employee's lack of express authorization to keep a weapon. Although undoubtedly these aspects have a significant bearing on the question presented, I would leave them for the jury to consider and decide. Whether or not a given state of affairs presents a jury question is often a matter of line drawing. The presence of these two factors, viewed against the overall calculus of surrounding facts and circumstances, does not lead, at least in my way of thinking, to an ineluctable conclusion that the case must be decided as a matter of law. I cannot draw the line in the manner suggested by the majority and would leave the jury's verdict undisturbed.