76 P.3d 550

STATE of Hawai'i, University of Hawai'i; and Rob Wallace, Appellants–
Appellants/Cross–Appellees,

v.

William D. HOSHIJO, Executive Director, on behalf of the complaint filed by Eric WHITE, and the Civil Rights Commission, State of Hawai'i, Appellees–Appellees/Cross–Appellants.

No. 22379.

Supreme Court of Hawai'i.

Sept. 12, 2003.

Russell A. Suzuki, Deputy Attorney General, State of Hawai'i, on the briefs, for Appellant–Appellant State of Hawai'i University of Hawai'i.

John Ishihara (Hawai'i Civil Rights Commission), Honolulu, on the briefs, for Appellees–Appellees/Cross–Appellants William D. Hoshijo and Hawai'i Civil Rights Commission.

Edward C. Kemper (Kemper & Watts), Honolulu, on the briefs, for Amicus Curiae The American Civil Liberties Union of Hawai'i Foundation.

LEVINSON, ACOBA, JJ., and Circuit Judge AUGUST, Assigned by Reason of Vacancy; and NAKAYAMA, J., Dissenting, with whom MOON, C.J., Joins.

Opinion of the Court by ACOBA, J.

We hold that when reviewing a decision of the Hawai'i Civil Rights Commission (HCRC) the standard of review, pursuant to Hawai'i Revised Statutes (HRS) § 368–16(a) (1993), for the circuit court to apply, is *de*

*novo* review. On appeal from the circuit court's decision, pursuant to HRS § 368–16(d) (1993), this court applies the same standard of review applicable to all other appeals from the circuit court. Accordingly, the circuit court's findings of fact are to be reviewed upon a clearly erroneous standard, and its conclusions of law are to be reviewed *de novo* under the right or wrong standard. Inasmuch as the findings of fact of the Circuit Court of the First Circuit[1] (the court) are supported by the record and are not clearly erroneous, and the conclusions of law are not wrong, we hold that (1) Rob Wallace (Wallace) was acting as an agent of the University of Hawai'i (UH), (2) Wallace was acting within the scope of his authority when he directed a racial slur at Eric White (Complainant), and (3) Wallace's utterances were not protected by the First Amendment. Accordingly, the court's February 24, 1999 order affirming in part and reversing in part the final decision of the HCRC, and its February 26, 1999 judgment are affirmed.

I.

Appellant – Appellant/Cross – Appellee[2] State of Hawai'i, UH, (Appellant), seeks review of the court's February 24, 1999 order,[3] affirming in part and reversing in part the final decision of the HCRC.[4] Both the HCRC[5] and the court, on appeal from the HCRC, held Appellant liable to Appellees–Appellees/Cross–Appellants William D. Hoshijo, the Executive Director of the HCRC appearing on behalf of Complainant, and the HCRC (collectively Appellees) for discrimination in public accommodations pursuant to HRS §§ 489–3 (1993) and 489–9 (1993). The court reversed the HCRC's finding that Wallace was an employee of UH,

---

1. The Honorable B. Eden Weil, now Eden E. Hifo, presided over the circuit court matter.

2. Wallace was initially an Appellant–Appellant/Cross–Appellee, but was dismissed from this appeal by stipulation filed on September 17, 1999.

3. *See State v. Hoshijo*, Civ. No. 98–2810–06, Order Affirming in Part and Reversing in Part Final Decision of Hawai'i Civil Rights Commission (Haw. 1st Cir.Ct. Feb. 24, 1999), *available at* Http://www.state.hi.us/hcrc/cases/White.txt.

4. Then-chairperson Claudio Suyat and Commissioners Allicyn Hikida Tasaka, Faye Kennedy, Jack Law, and Harry Yee presided over the matter.

5. *See Hoshijo v. State*, No. 97–001–PA–R, Final Decision and Order(Haw. Civ. Rights Comm. Feb. 24, 1999), *available at* Http://www.state.hi.us/hcrc/cases/Whitefin.txt.

but affirmed the finding that he was an agent of that institution.

On appeal to this court, Appellant contends that the court erred in holding that (1) Wallace was acting within the scope of his agency relationship when dealing with spectators, and (2) Wallace did not enjoy First Amendment [6] rights protective of the words which were the subject matter of the alleged discrimination.[7] Appellees cross-appealed, claiming that the court erred in ruling that Wallace was only acting as an agent and not as an employee. Because we affirm the court's decision, we need not address Appellees' argument on cross-appeal.[8]

## II.

The following relevant facts are not in dispute. Coach Riley Wallace (Coach) is the head coach of the UH basketball team. The UH Special Events Arena (Arena) is owned by UH and managed by its Department of Intercollegiate Athletics (Athletic Department). Wallace was a student manager of the basketball team. Wallace is Coach's son.

The basketball team had two student managers who performed various functions for the basketball team. Student managers are selected by the coach of the basketball team and are supervised by the team's coaches. These student managers receive athletic scholarships, which include tuition waivers, book loans, and money for housing and meals. The scholarship funds are held in UH's general scholarship account and are administered by the Athletic Department. The university considers student managers to be student athletes and requires that they be full-time students, carry at least twelve credits of course work, and maintain a grade point average of at least 2.0.

Student managers are not paid a salary. As such, student managers are not given employee identification numbers and are not included on UH's payroll. They are also not provided benefits such as annual leave, workers' compensation, or health insurance. Taxes are not withheld from the scholarship monies awarded.

Student managers perform various functions for the basketball team. They assist coaches, prepare the gym for practice, and issue equipment. During the regular season they set up drinking water and equipment in the Arena, maintain the equipment and locker rooms, wipe the basketball floor during games, pack the players' travel bags, and accompany the team to off campus games. Post-season duties include gathering equipment and attending post-season workouts.

Student athletes and student managers are also required to attend and participate in various fund raising events, such as golf tournaments and dinner auctions and to socialize with the public at these functions. The Athletic Department permits student managers to speak to spectators and members of the public at team practices and games.[9] The court found that "[t]he express language in the [UH Student–Athlete Handbook (Handbook)] and the facts under de novo review demonstrate that it was anticipated that during a [UH] basketball game, Wallace would have contact with the public and that such

---

**6.** The First Amendment to the United States Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or *abridging the freedom of speech*, or of the press; or the right of people peaceably to assemble, and to petition the Government for a redress of grievances." (Emphasis added).

**7.** On or about December 30, 1999, the American Civil Liberties Union (ACLU) filed an *amicus curiae* brief regarding First Amendment issues relating to HRS chapter 489. The ACLU argued that the First Amendment is not a barrier to holding UH liable for Wallace's discriminatory acts because a law is constitutional under the First Amendment (1) if it promotes a substantial government interest, (2) if the government interest is not in suppressing free expression, and (3) if the incidental restriction on speech is not greater than necessary to promote the government interest.

**8.** Inasmuch as we affirm the court's holding that Wallace was an agent of UH, and was acting within the scope of his agency relationship, we need not specifically decide whether Wallace was also an employee of UH.

**9.** Appellant disputes that Wallace was expected to have contact with the public during games. As explained, *infra*, we review the findings of fact of the circuit court under the clearly erroneous standard.

contact would be within the scope of his authority as an agent." [10]

A student manager's conduct is regulated by the Handbook, which is given to each student manager at the beginning of the school year, and reviewed with them by the then-Director of the Athletics Department, Hugh Yoshida (Yoshida). The Handbook explains that student athletes and student managers "have special interests and responsibilities that do not apply to other students." It declares that such students "represent[ ] the University of Hawaiʻi and all the people of Hawaiʻi[,]" and, as such, they "will be in the 'public eye' and [their] personal conduct should reflect favorably upon ... [themselves, their] team and the University." The Handbook requires "sportsmanlike" conduct and declares that "[u]sing obscene or inappropriate language or gestures to officials, opponents, team members or spectators" will not be tolerated. Student managers are required to abide by the Code of Conduct (Code) outlined in the Handbook.

A violation of the Code may be considered a minor or major violation. For example, directing a racial slur toward a spectator is prohibited by the Code and is punishable as a minor violation. Minor violations are disciplined by the head coach and may include temporary suspension from the team. Violent behavior, criminal activity, and drug use are considered major violations, and, as such, the head coach must immediately suspend the student athlete or student manager and refer the matter to the Athletic Director for further disciplinary action. However, a scholarship can only be rescinded if a student quits, becomes academically ineligible, or commits major misconduct.

### III.

On or about February 18, 1995, Complainant attended a UH basketball game at the Arena. An avid fan, Complainant sat near the team and yelled comments about the referees and opposing players during the first half of the game. The game's score was very close, and in the second half, Complainant became frustrated as he believed that the coaches were mistaken in their decisions.

Complainant yelled the following at the coaching staff: "You're a dinosaur coach!" "You're blowing it!" "You don't know what you are doing!" "Stupid move!" "Play your bench!" "Put Woody [Woodrow Moore] in!" "You gotta use Woody, Woody can do it!" "You can't coach talented players!" "Play your best players!" Complainant's statements irritated Wallace. At one point, Wallace notified Rich Sheriff (Sheriff), the Arena manager, about Complainant, but Sheriff did nothing because in his opinion Complainant's remarks were not offensive.

During the last two minutes of the game, Complainant yelled something like, "You should pack your bags and go already!" Wallace became enraged and turned toward Complainant and yelled, "Shut up you f[**]king nigger! I'm tired of hearing your shit! Shut your mouth or I'll kick your ass!" Complainant responded, "Oh yeah, punk, come over and try it! You see me all the time, what's the problem?" Wallace then moved to within a few feet of Complainant and shouted, "Just shut up, nigger or I'll kick your ass!" Complainant retorted, "Oh yeah, you and who else!" At this point, the assistant Arena manager, Adam Primas, intervened, and Wallace left for the locker room.

After Wallace left, Complainant turned to the boosters [11] and security personnel around him and shouted, "Did you hear what he called me? Did you hear that?" Coach did not personally hear the exchange, but was informed that Complainant and Wallace were arguing. Coach went to where Complainant was sitting and with his back to Complainant, stated, "Eric, could you please take it easy on

---

10. In the HCRC opinion, it stated that "[t]he Commission believes that a student manager trying to quiet down a loud spectator would be acting within the scope of his authority to do things to assist the team if done in a non-racist, non-threatening manner." It then ruled that Wallace's conduct was within the scope of employment as "Wallace's actions do not fall outside the scope of his authority simply because of the language he used."

11. The booster club consists of members of the community who support the UH basketball team and hold fund-raisers and events in support of the team.

**312**

my son?" Complainant, only then realizing that Wallace was Coach's son, responded, "Coach, when your son uses the 'N' word, he's no longer your son. I'm going to break his punk ass." Coach did not respond. The game ended shortly thereafter.

Someone notified Sheriff of the incident and he went to Complainant and demanded, "[W]hat the hell were you doing?" Complainant then told Sheriff and a security guard that Wallace had called him a "nigger" [12] (hereinafter "racial slur," unless contained within a direct quotation) and that he wanted to make a complaint. The security guard denied hearing Wallace use a racial slur. Sheriff told Complainant to file a complaint with the Honolulu Police Department (HPD). Some of Complainant's friends told Sheriff and the security guard to leave as they would handle the situation. Sheriff informed Yoshida of the incident and they both questioned a spectator sitting in the area at the time of the incident. The spectator denied hearing Wallace use a racial slur. Yoshida then approached Wallace, and Wallace admitted to the racial slur, and apologized for his actions.

Complainant left the Arena and called the HPD from the parking lot. HPD responded to the scene and Complainant reported the incident. HPD determined that the matter was civil in nature. Artie Wilson (Wilson) learned of the incident and told Complainant that he would try to arrange a meeting to "patch things up." Wilson then asked Coach and Yoshida to meet with Complainant. Yoshida told Complainant that he wanted to "settle this thing" and "talk it over as men." Complainant then met with Coach, Coach's wife, and Wallace in Sheriff's office.

Coach made a waving motion with his hand towards Yoshida, indicating to Yoshida that he was not needed, and Coach shut the door to the office. Complainant felt intimidated and uncomfortable being alone with Coach's family. Coach then explained to Complainant that Wallace's actions were that of a son protecting his father, but that it was wrong.

Wallace told Complainant that he "lost it" after hearing Complainant's comments and apologized. Complainant told Wallace that he "kind of lost it too," but that he did not like the racial slur, and did not want to hear it again. Complainant then shook hands with Wallace, hugged him, and shook hands with Coach and his wife.

Yoshida drove Complainant home after the meeting. Complainant told Yoshida that Wallace had apologized, that he understood what had happened, and that he was partly at fault. At this point, Yoshida believed everything had been resolved and decided not to investigate further or impose discipline on Wallace. That night, Complainant had a difficult time sleeping and stayed up late thinking about the incident.

The next day at basketball practice, Coach informed the team that Wallace had used a racial slur toward a spectator and that Wallace wanted to apologize to the team for his actions. Wallace was not at practice that day. He did pack the team's travel gear for their road trip, but did not accompany the team as it was the other student manager's turn to travel.

On or about the evening of February 19, 1995, Complainant received a telephone call from an African American member of the basketball team. The player told Complainant that some African American players were upset by Wallace's use of the racial slur. They were not happy that Wallace had not been disciplined, especially because an African American player had been suspended for using profanity at a coach. He also informed Complainant that Coach had instructed the players not to speak to Complainant.

Complainant became more upset and believed that punishment was warranted. On February 21, 1995, Complainant met with Coach at the airport and advised him that he believed his civil rights were violated and that it was unfair that Coach had done nothing. He requested that Wallace be suspended "to make him an example for the African Americans on the team." Coach responded

---

**12.** *See, e.g., Swinton v. Potomac Corp.,* 270 F.3d 794, 817 (9th Cir.2001) (stating that the word "nigger" is " 'perhaps the most offensive and inflammatory racial slur in English, ... a word expressive of racial hatred and bigotry' " (quoting *Merriam–Webster's Collegiate Dictionary* 784 (10th ed.1993))), *cert. denied,* 535 U.S. 1018, 122 S.Ct. 1609, 152 L.Ed.2d 623 (2002).

that he considered the matter closed and would not take further action as Wallace had suffered enough. Coach also told Complainant to "go hire a lawyer and do what you have to do to feel good about this."

Complainant next met with Yoshida and asked Yoshida to take action against Wallace. Yoshida stated that he thought the matter had been resolved, and no disciplinary action had been imposed, but that he would discuss the matter with Coach.

Yoshida conferred with Coach and they agreed to immediately suspend Wallace. On or about February 23, 1995, Yoshida informed Wallace of the suspension. Yoshida also asked Primas and Sheriff to submit written reports regarding the incident. Yoshida then called Complainant and stated, "Your civil rights have been violated ... if it's any consolation, ... Wallace ha[s] been suspended." Wallace was suspended for the remainder of the 1994–1995 season, but retained his athletic scholarship for that school year.

About a week after the incident, Primas met with the Arena staff, discussed the incident, and instructed the staff to "treat everybody with respect" and to remain calm and professional in such situations. As of at least December 2, 1997, UH had not held any training sessions for its coaches, student ath-

letes, student managers, or Arena staff regarding state or federal public accommodation laws or procedures regarding a public accommodation complaint.

### IV.

On or about August 17, 1995, Complainant filed a complaint with the HCRC. A contested case hearing was held, after which the hearings examiner [13] made findings of fact and conclusions of law [14]. The examiner concluded, *inter alia*, that Wallace was not an employee of UH, but was an agent of UH and, as such, UH was liable on a theory of respondeat superior, and Wallace himself was personally liable. The examiner recommended the following penalties: (1) compensatory damages to Complainant of $10,000 from UH and Wallace jointly, and $10,000 from UH; [15] (2) civil penalties of $500 against Wallace, and $1,000 against UH; [16] and (3) various equitable relief.

The parties timely filed written exceptions and requested oral argument before the HCRC. After oral argument,[17] the HCRC issued a final decision on February 24, 1999. The HCRC adopted most of the hearing examiner's recommendations, agreeing that Wallace was an agent acting within the scope of his authority, but also deciding that

---

**13.** Livia Wang was the HCRC Hearings Examiner who presided over the contested case hearing. Wang submitted the Hearing Examiner's Finding of Fact, Conclusion of Law and Recommended Order on or about February 2, 1998.

**14.** *See Hoshijo v. State,* Doc. No. 97–001–PA–R, Hearing Examiner's Finding of Fact, Conclusions of Law and Recommended Order (Haw. Civ. Rights Comm. February 2, 1998), *available at Http://www.state.hi.us/hcrc/cases/Whitedra.txt.*

**15.** HRS § 368–17(a) (1993) provides for compensatory damages and in relevant part, states as follows:

(a) The remedies ordered by the commission or the court under this chapter may include compensatory and punitive damages and legal and equitable relief, including, but not limited to:

....

(8) Payment to the complainant of damages for an injury or loss caused by a violation of chapters 489, 515, part I of chapter 378, or this chapter, including a reasonable attorney's fee[.]

**16.** HRS § 489–8 (1993) provides for civil penalties as follows:

It shall be unlawful for a person to discriminate unfairly in public accommodations. Any person, firm, company, association, or corporation who violates this chapter shall be fined a sum of not less than [than] $500 nor more than $10,000 for each violation, which sum shall be collected in a civil action brought by the attorney general or the civil rights commission on behalf of the State. The penalties provided in this section shall be cumulative to the remedies or penalties available under all laws of this State. Each day of violation under this chapter shall be a separate violation.

(Brackets in original.)

**17.** Oral argument was heard by the commission on or about April 3, 1998, and Commissioners Law, Tasaka, Kennedy, and Yee were present and took part in the Final Decision and Order filed on February 24, 1999. Chairperson Suyat was unavailable for the oral argument, but read the submissions and listened to a tape recording of the oral argument, and participated in the decision.

Wallace was a UH employee. The HCRC increased UH's share of compensatory damages owed from $10,000 to $20,000, in addition to the $10,000 UH owed jointly with Wallace. Appellant timely appealed the HCRC's final decision[18] to the court. As mentioned, the court affirmed the HCRC's final decision, except it reversed as to the finding that Wallace was an employee of UH, ruling that "[t]he indicia of employee status are not present under the facts because Wallace received a scholarship and performed work in order to maintain the scholarship."

The court found that "Appellant[ ] conceded during oral argument, and the [c]ourt agree[d] on de novo review, that Wallace was an agent of U.H. at the time of the incident." It also made the following findings and conclusions with respect to Wallace acting within the scope of his authority as an agent:

> U.H. expected that Wallace would have contact with the public. U.H. gave Wallace an athletic scholarship for working. Wallace's behavior ... [was] governed by the ... Handbook. The Handbook has entries governing interaction with spectators and recognizes that athletes, including ... [student] managers, would be in the public eye. [The Handbook] ... prohibits obscene and inappropriate language by athletes. It is undisputed and the [c]ourt finds as a fact that U.H. suspended Wallace for his conduct toward ... [Complainant] because of his violation of the Handbook. *The express language in the Handbook and the facts under de novo review demonstrate that it was anticipated that during a U.H. basketball game, Wallace would have contact with the public and that such contact would be within the scope of his authority as an agent. Thus, the [c]ourt concludes that the incident on February 18, 1995, was within the scope of Wallace's authority as an agent.*

(Emphasis added.)

Appellant alleges that the court erred in its findings and conclusions that UH "expect-

ed that ... Wallace would have contact with the public during basketball games and thus was an agent of the University." It contends that while Wallace was in the public eye and may have certain contact with the public, he was to focus all of his attention on the team during a game. Also, only appropriate contact with the public was authorized.

With respect to the First Amendment issue, the court made the following findings and conclusions:

> The [c]ourt's conclusion that Wallace was an agent acting within the scope of his authority means that contrary to his claim Wallace was not a private individual acting entirely in a private capacity, but a public employee or agent for the purposes of First Amendment Analysis.... *The [c]ourt concludes that Wallace's use of the word "nigger" did not involve a matter of public concern. Therefore, the words spoken by Wallace to ... [Complainant] on February 18, 1995, were not entitled to First Amendment protection. Thus, as a matter of law, the ... HCRC's actions were not prohibited by the First Amendment, and Wallace is liable for his conduct.*

(Emphasis added.)

Appellant disputes the above findings and conclusions and argues that Wallace was acting as a private individual and his speech was protected under the First Amendment.

## V.

At the circuit court level, there appears to be a question with reference to HRS §§ 368–16(a) and 91–14(g) (1993) and the standard of review to be applied by the circuit court on an appeal from a decision of the HCRC. *See, e.g., Aloha Islandair, Inc. v. Hoshijo,* Civ. No. 00–1–3779–12(EEH), 2001 WL 1912333, at *4 (Haw.Cir.Ct. August 9, 2001) (finding "that the specific language of H.R.S. § 368–16(a) requiring *de novo* review would control over the general language of H.R.S. § 91–14(g)[,]" but applying both stan-

---

**18.** HRS § 368–16(a) provides in relevant part that "[a] complainant and a respondent shall have a right of appeal from a final order of the commission, ... [but i]f an appeal is not taken within thirty days ... the commission may obtain an order of enforcement from the circuit court...."

dards to its decision); *State v. Hoshijo*, Civ. No. 98–2810–06, Order Affirming in Part and Reversing in Part Final Decision of Hawai'i Civil Rights Commission at 1 (Haw. 1st Cir. Ct. Feb. 24, 1999) [19] (finding "that there is an apparent conflict between the standard in H.R.S. § 368–16[a] (de novo review) for reviewing final decisions of the [HCRC] and the standard contained in H.R.S. § 91–14(g) for reviewing agency appeals[,]" and applying both standards in its decision). We address the question to clarify the proper standard of review to be utilized by the circuit court.

HRS § 368–16(a) deals only with the HCRC, and provides as follows:

(a) A complainant and a respondent shall have a right of appeal from a final order of the commission, including cease and desist orders and refusals to issue charges in the circuit court for the circuit in which the alleged violation occurred or where the person against whom the complaint is filed, resides, or has the person's principal place of business. *An appeal before the circuit court shall be reviewed de novo.* If an appeal is not taken within thirty days after the service of an appealable order of the commission, the commission may obtain an order for the enforcement of the order from the circuit court that has jurisdiction of the appeal.

(Emphasis added.) *Black's Law Dictionary* 435 (6th ed.1990) defines "*de novo*" as follows: "Anew; afresh; a second time." By way of illustration, it is "as if the reviewing court is the front-line judicial authority and, therefore, accord[s] no deference to the lower courts' determinations." *State v. Navas*, 81 Hawai'i 113, 120, 913 P.2d 39, 46 (1996). HRS § 91–14(g) pertains to appeals from administrative agencies generally and provides as follows:

(g) Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:

(1) In violation of constitutional or statutory provisions; or

(2) In excess of the statutory authority or jurisdiction of the agency; or

(3) Made upon unlawful procedure; or

(4) Affected by other error of law; or

(5) *Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record;* or

(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

(Emphasis added.) This court has stated with regard to review of an *agency decision* that,

[u]nder HRS § 91–14(g), conclusions of law are reviewable under subsections (1), (2), and (4); questions regarding procedural defects under subsection (3); findings of fact under subsection (5); and an agency's exercise of discretion under subsection (6). *Accordingly, a reviewing court will reverse an agency's finding of fact if it concludes that such agency finding is clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record. HRS § 91–14(g)(5). On the other hand, the agency's conclusions of law are freely reviewable.*

*Hardin v. Akiba*, 84 Hawai'i 305, 310, 933 P.2d 1339, 1344 (1997) (citations omitted). Thus, according to HRS § 368–16(a), the circuit court is to perform a *de novo* review of a decision of the HCRC; however, under HRS § 91–14(g), a reviewing court applies a clearly erroneous standard to the findings of fact by an agency, and *de novo* review of its conclusions of law under the right or wrong standard.

■ This court has stated that "[w]here there is a 'plainly irreconcilable' conflict between a general and a specific statute concerning the same subject matter, the specific will be favored.... [W]here the statutes simply overlap in their application, effect will be given to both if possible, as repeal by implication is disfavored." *Metcalf v. Voluntary Employees' Ben. Ass'n of Hawai'i*, 99 Ha-

19. *See supra* note 3.

wai'i 53, 59, 52 P.3d 823, 830 (2002) (quoting *Wong v. Takeuchi,* 88 Hawai'i 46, 53, 961 P.2d 611, 618, *reconsideration denied* (1998) (quoting *State v. Vallesteros,* 84 Hawai'i 295, 303, 933 P.2d 632, 640, *reconsideration denied,* 84 Hawai'i 496, 936 P.2d 191 (1997))). While both HRS §§ 368–16(a) and 91–14(g) are directed at agency decisions, HRS § 368–16(a) is concerned solely with the appropriate standard of review of a HCRC decision in the circuit court. Inasmuch as HRS § 368–16(a) is the more specific statute, the appropriate standard of review of the HCRC's decision in the circuit court is *de novo* review.

This conclusion is further supported by legislative history. In 1991, Senate Bill 1539 was introduced to, *inter alia,* "[e]liminate the provisions for de novo review of the Commission's decisions by the circuit court." Sen. Stand. Comm. Rep. No. 487, in 1991 Senate Journal, at 951. The reason for proposing a change in the standard of review was to align the HCRC with other agencies for purposes of review:

> De novo review of the Commission's determinations subjects the Commission to standards disparate from the standards of other state agencies which are not subject to de novo review. *Your Committee has amended this measure by amending Section 368–16, HRS, to eliminate de novo review and to have appeals be subject to Chapter 91, administrative review.*

Hse. Stand. Comm. Rep. No. 1247, in 1991 House Journal, at 1297 (emphasis added). But, in opposition to the amendment, the "concern expressed was that it was premature to eliminate the procedural safeguard provided by de novo review of the Commission's decision, which permits the courts to consider both evidence and legal conclusions without according deference to the Commission." [20] Sen. Stand. Comm. Rep. No. 487, in 1991 Senate Journal, at 951. Apparently, as a result of such concerns, the legislature rejected the amendment to HRS § 368–16(a). Hence, *de novo* review was not eliminated in favor of HRS § 91–14(g) review. *See* 1991 Haw. Sess. L. Act 252, §§ 1–9, at 549–53 (approving Senate Bill 1567 on June 12, 1991). Since the rejection of the amendment in 1991, the legislature has not addressed this issue again.

Therefore, based upon the foregoing legislative history, the circuit court's duty to apply *de novo* review to HCRC decisions pursuant to HRS § 368–16(a) remains intact.

## VI.

■ In line with HRS § 368–16(a), HRS § 368–16(d), which also specifically relates to the HCRC, provides that "[t]he final judgment or decree of the circuit court shall be subject to review by appeal in the same manner and form as other appeals from that court." Generally, on appeal to this court, "[t]he weight and credibility of evidence is for the circuit court to determine and its findings of fact will not be set aside unless they are clearly erroneous." *Beneficial Hawai'i, Inc. v. Casey,* 98 Hawai'i 159, 167, 45 P.3d 359, 367 (citing *Welton v. Gallagher,* 65 Haw. 528, 530, 654 P.2d 1349, 1351 (1982); *Molokoa Village Dev. Co., Ltd. v. Kauai Elec. Co.,* 60 Haw. 582, 592, 593 P.2d 375, 382 (1979)), *reconsideration denied* (2002). Also, this court reviews the circuit court's conclusions of law *de novo* under the right or wrong standard. *Gonsalves v. Nissan Motor Corp. in Hawai'i, Ltd.,* 100 Hawai'i 149, 159, 58 P.3d 1196, 1206 (citing *Child Support Enforcement Agency v. Roe,* 96 Hawai'i 1, 11,

---

20. One opponent of the amendment, Representative Taniguchi, made the following speech:

> I speak out against the proposed bill as currently written because it is unnecessary, premature and unfair in my estimation. It will eliminate the only protection employees and employers have to have a court of law review the factual determinations of the Civil Rights Commission de novo.
> ....
> Currently and as originally enacted, Chapter 368 requires de novo review. Both the Hawai'i Women's Political Caucus and the Chamber of Commerce testified that eliminating the de novo review is a bad idea. The Commission seeks to insulate itself from a court review by replacing de novo review with Chapter 91 review. Chapter 91 review alone I feel is not good enough. The Civil Rights Commission is the only State Commission with drastic power to award compensatory and punitive damages, yet relies exclusively, according to this bill, on a streamlined hearing process.

Comment by Representative Taniguchi in 1991 House Journal, at 516.

25 P.3d 60, 70 (2001)), *amended* (Dec. 18, 2002), *reconsideration denied,* 101 Hawai'i 1, 61 P.3d 512 (2002).

■ Hence, this court's standard of review of an appeal from the circuit court regarding an appeal from the HCRC is that we review the findings of fact of the circuit court under a clearly erroneous standard, and its conclusions of law *de novo* under the right or wrong standard.

## VII.

This court has said that "[t]he public policy of the State of Hawaii disfavoring racial discrimination is embodied in our statutes and our Constitution."[21] *Hyatt Corp. v. Honolulu Liquor Comm'n,* 69 Haw. 238, 244, 738 P.2d 1205, 1208 (1987) (citations and footnote omitted). "The strength of this expressed public policy against racial discrimination is beyond question." *Id.* at 244, 738 P.2d at 1208–09. HRS chapter 489 reinforces this public policy.[22] In that connection, HRS § 489–3 provides that "[u]nfair discriminatory practices which deny, or attempt to deny, a person the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of a place of public accommodations on the basis of race, sex, color, religion, ancestry, or disability are prohibited."

■ Chapter 489 does not expressly state who may be held liable for violations of HRS § 489–3. However, HRS § 489–8 states in relevant part that "[i]t shall be unlawful for a *person* to discriminate unfairly in public accommodations." (Emphasis added.) "Person" is defined in HRS § 489–2 (1993), which broadly states that "[p]erson has the meaning prescribed in [HRS] section 1–19[ [23] ] and *includes* a legal representative, partnership, receiver, trust, trustee in bankruptcy, the State, or any governmental entity or agency." (Emphasis added.) While HRS § 489–3 does not make reference to "person," we read it *in pari materia* with HRS § 489–8. *See* HRS § 1–16 (1993) ("Laws in pari materia, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called in aid to explain what is doubtful in another."). Concerning the same subject matter, HRS § 489–3, read *in pari materia* with HRS § 489–8, indicates that liability under HRS § 489–3 for discriminatory practices in public accommodations would attach to a "person" as defined in HRS § 489–2.

Additionally, we may look to Title II of the Civil Rights Act of 1964 after which HRS chapter 489 was patterned for guidance. *See* Hse. Stand. Comm. Rep. No. 233–86, in 1986 House Journal, at 1086–87 ("Testimony by the Office of the Governor, Affirmative Action Program stated that Hawai'i should join the other 38 states . . . in enacting laws that would be in keeping with Title II of the Civil Rights Act.").[24] Title II of the Civil Rights

---

21. Article I, section 5 of the Hawai'i State Constitution provides as follows: "No person shall be deprived of life, liberty or property without due process of law, nor denied the equal protection of the laws, nor be denied the enjoyment of the person's civil rights *or be discriminated against in the exercise thereof because of race, religion, sex, or ancestry.*" (Emphasis added.)

22. While the parties do not question whether an employee's or agent's use of a racial slur may constitute unfair discrimination under HRS chapter 489, courts of other states have found such utterances actionable discrimination under their public accommodation law. *See, e.g., King v. Greyhound Lines, Inc.,* 61 Or.App. 197, 656 P.2d 349, 352 (1982) (stating that "the chief harm resulting from the practice of discrimination by establishments serving the general public is not the monetary loss of a commercial transaction or the inconvenience of limited access but, rather, the greater evil of unequal treatment,

which is the injury to an individual's sense of self-worth and personal integrity").

23. HRS § 1–19 (1993) provides as follows:

§ 1–19 **"Person," "others," "any," etc.** The word "person," or words importing persons, for instance, "another," "others," "any," "anyone," "anybody," and the like, *signify not only individuals,* but corporations, firms, associations, societies, communities, assemblies, inhabitants of a district, or neighborhood, or persons known or unknown, and the public generally, where it appears, from the subject matter, the sense and connection in which such words are used, that such construction is intended.

(Emphasis added.)

24. While federal law and "a federal court's interpretation . . . [of that law] is not binding on this court's interpretation of civil rights laws," it can be a "useful analytical tool," especially in light of

Act of 1964, 42 U.S.C.2000(a) (1964) *et seq.* [Title II] does not refer to "person" or contain a related definition. However, the congressional report indicates that a person who is an "owner, operator, lessee, agent, or employee" of a public accommodation is subject to liability. H.R.Rep. No. 914, 88th Cong., 2d Sess. (1964), U.S.Code Cong. & Admin.News 1964 at 2355. Construing HRS chapter 489, which is to "be liberally construed[,]" HRS § 489–1(b) (1993), in light of Title II legislative history, we conclude liability attaches to a person that is an owner, operator, lessee, agent, or employee of a public accommodation.

■ The Arena is a public accommodation owned by UH, a state university.[25] Thus, as an owner, UH is liable for the discriminatory acts of its agents and employees under the doctrine of respondeat superior. Under that doctrine UH is liable for Wallace's actions if Wallace was an agent or an employee of UH acting within the scope of his authority. *See Restatement (Second) of Agency,* § 219(1) (1958) [hereinafter *Restatement* ].

### VIII.

### A.

"An agency relationship may be created through actual or apparent authority." *Cho Mark Oriental Food, Ltd. v. K & K Int'l,* 73 Haw. 509, 515, 836 P.2d 1057, 1061 (1992) (citing *Wells Fargo Bus. Credit v. Ben Kozloff, Inc.,* 695 F.2d 940, 944–45 (5th Cir.), *cert. denied,* 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983); *Restatement, supra,* §§ 7, 8, 26, 27). There have been no allegations regarding apparent authority and, as such, we do not consider it. " 'Actual authority exists only if there has been a manifestation

by the principal to the agent that the agent may act ..., and may be created by *express agreement or implied from the conduct of the parties or surrounding circumstances.*' " *State Farm Fire & Cas. Co. v. Pacific Rent-All, Inc.,* 90 Hawai'i 315, 325, 978 P.2d 753, 763 (emphasis omitted) (emphasis added) (quoting *Cho Mark,* 73 Haw. at 515–16, 836 P.2d at 1061–62 (internal quotation marks, citations, and brackets omitted)), *reconsideration denied,* 90 Hawai'i 315, 978 P.2d 753 (1999). "Express actual authority requires an oral or written agreement between the parties that the principal has delegated authority that the agent has accepted and that authorizes the agent to do certain acts." *Cho Mark,* 73 Haw. at 515–16, 836 P.2d at 1062 (citing *Hawaiian Paradise Park Corp. v. Friendly Broadcasting Co.,* 414 F.2d 750, 755 (9th Cir.1969) (applying Hawai'i law); *Gulf Ins. Co. v. Grisham,* 126 Ariz. 123, 613 P.2d 283, 286 (1980)). "Implied actual authority 'may arise either independent of any express grant of authority ... or it may arise as a necessary or reasonable implication required to effectuate some other authority expressly conferred by the principal.' " *Id.* at 516, 836 P.2d at 1062 (quoting *Wells Fargo Bus. Credit,* 695 F.2d at 944–45).

■ Wallace's responsibilities and duties were regulated by the Handbook, which expressly gave Wallace authority to perform various duties for the basketball team. Thus, an agency relationship between UH and Wallace was created by virtue of the express agreement contained, at the least, in the Handbook. In fact, UH does not dispute that as a student manager, "Wallace acted as an agent of UH for certain specific purposes."[26] These matters are supported by

the legislature's reference. *Furukawa v. Honolulu Zoological Soc'y,* 85 Hawai'i 7, 13, 936 P.2d 643, 648, *reconsideration denied,* 85 Hawai'i 7, 936 P.2d 643 (1997).

**25.** There is no dispute that the Arena is a public accommodation as defined by HRS § 489–2. HRS § 489–2(6) states in relevant part that "[b]y way of example, but not of limitation, place of public accommodation includes facilities of the following types: ... A ... sports arena ... or other place of exhibition or entertainment."

**26.** The dissent posits that whether *"implied authority* "exists" requires focusing on Wallace's

reasonable understanding of his authority[.]" Dissent at 323, 76 P.3d at 566. It is undisputed that student managers were required to interact with the public at various fund raising events and that student managers were permitted to speak with the public at team practices, and, as the circuit court held, at games. This is a finding of fact, which as explained above, we review under the clearly erroneous standard. It is reasonable to infer that UH expected that Wallace would interact with the public at games as it allowed him to interact at various other events. As such,

the record, and, as such, we affirm the court's finding that, in his capacity as student manager, Wallace was an agent of UH.[27]

■ As previously indicated, UH argues that it is not liable for Wallace's actions because Wallace was acting outside the scope of his authority. UH is correct that it is not *ipso facto* liable for Wallace's actions simply by virtue of his agency status, for generally, a principal can only be held vicariously liable for the actions of an agent under the theory of respondeat superior. *See Restatement, supra,* § 219(1), at 481.

### B.

"A master is a species of principal and, a servant is a species of agent." *Restatement, supra,* § 2 cmt. a., at 13. It is well established that "[a] master is subject to liability for the torts of his [or her] servants committed while acting in the scope of their employment." *Restatement, supra,* § 219(1), at 481. *See Wong–Leong v. Hawaiian Indep. Refinery, Inc.,* 76 Hawai'i 433, 438, 879 P.2d 538, 543 (1994) ("Under the theory of respondeat superior, an employer may be liable for the negligent acts of its employees [or agents] that occur within the scope of their employment[ ]" or authority. (citing *Henderson v. Professional Coatings Corp.,* 72 Haw. 387, 391–92, 819 P.2d 84, 88 (1991) (other citations omitted)); *cf. Lucas v. Liggett & Myers Tobacco Co.,* 50 Haw. 477, 480, 442 P.2d 460, 463, (" 'A principal who puts a servant or other agent in a position which enables the [servant], while apparently acting within his authority, to commit a fraud upon third persons is subject to liability to such third persons for fraud.' " (Quoting *Restatement, supra,* § 261 at 570.)), *rehearing denied* (1968). The *Restatement* also notes that "[a]n act may be within the scope of employment although consciously criminal or tortious." *Restatement, supra,* § 231, at 512; *see also Lucas,* 50 Haw. at 482, 442 P.2d at 463 (quoting *Restatement, supra,* § 231 approvingly). "Vicarious liability under the respondeat superior doctrine ordinarily requires some kind of employment relationship or other consensual arrangement under which one person *agrees to act under another's control.*" Dan B. Dobbs, *The Law of Torts,* § 335, at 910 (2000) (footnote omitted) (emphasis added). As mentioned above, Coach was Wallace's supervisor. The Handbook regulated Wallace's conduct as a student manager. Wallace was thus subject to control by UH.

■ But, "[w]hether [an] employee [or agent] is acting within the scope of his [or her] employment [or agency relationship] is a question of fact to be determined in the light of the evidence of each particular case[.]" *Henderson,* 72 Haw. at 393, 819 P.2d at 89 (quoting *Kang v. Charles Pankow Assocs.,* 5 Haw.App. 1, 8, 675 P.2d 803, 808 (1984) (internal quotation marks and other citations omitted)). This court has cited the *Restatement, supra,* § 228, at 504 as defining scope of authority:

> (1) Conduct of a servant is within the scope of employment[[28] or authority] if, but only if:

2257, 141 L.Ed.2d 633 (1998) (citing W. Keeton, D. Dobbs, R. Keeton, & D. Owen, *Prosser & Keeton on Law of Torts* § 70, at 505 (5th ed.1984)). However, " 'it is less likely that a willful tort will properly be held to be in the course of employment and that the liability of the master for such torts will naturally be more limited.' " *Id.* (citing F. Mechem, *Outlines of the Law of Agency,* § 394, at 266 (P. Mechem 4th ed.1952)).

28. As used in the *Restatement,* "[t]he word 'employment' [or employ] means the *subject matter* as to which the master and servant relationship exists." *Restatement, supra,* § 228 cmt. a., at 504. Therefore, an individual need not be an employee for respondeat superior liability to attach. The term "employment" is not limited to a

---

this finding of fact is supported by the record and we cannot find it to be clearly erroneous. The dissent broadly states that "Wallace was not an agent of UH at the time he yelled racial slurs at [Complainant]." Dissent at 324, 76 P.3d at 567. However, as UH conceded, "Wallace acted as an agent of UH for certain specific purposes." The question thus becomes whether he was acting within the scope of that authority at the time he made the racial slurs.

27. Neither party has alleged that Wallace's actions constituted an intentional tort. However, we note that an employer may be liable "for the intentional torts of [its] employee[ as] the law now imposes liability where the employee's 'purpose, however misguided, is wholly or in part to further the master's business.' " *Burlington Indus. Inc. v. Ellerth,* 524 U.S. 742, 756, 118 S.Ct.

(a) it is of the kind that he [or she] is employed to perform;

(b) it occurs substantially within the authorized time and space limits; and

(c) it is actuated at least in part, by a purpose to serve the master[.]

. . .

(2) Conduct of a servant is not within the scope of employment [or authority] if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.

*Wong–Leong*, 76 Hawai'i at 438, 879 P.2d at 543 (quoting *Henderson*, 72 Haw. at 391–92, 819 P.2d at 88) (citing *Restatement, supra*, § 228, at 504)) (brackets omitted). Applying the above-mentioned test, Wallace's actions fell within the scope of his authority.[29]

■ First, Wallace's conduct was of the kind that he was authorized to perform. Wallace, as a student manager, was required to attend games, to "[w]ork on the bench during the [basketball] game[,]" and to assist the team. It was foreseeable that Wallace would have some interaction with the public at games while acting in this capacity. This public interaction was described by UH as part of Wallace's duties. The Handbook thus envisioned that student managers would have contact with the spectators, and, as such, student managers were expressly prohibited from "[u]sing obscene or inappropriate lan-

guage or gestures to officials, opponents, team members or spectators." This admonition in the Handbook supports the conclusion that "[a]n act, although forbidden, or done in a forbidden manner, may be within the scope of employment." *Restatement, supra*, § 230, at 511.

■ Second, without a doubt, Wallace's conduct occurred within authorized time and space limits. Wallace was required to attend the UH basketball game as part of his duties. This game was held at the Arena, and Wallace sat on the team bench during the game. Wallace was to assist the team during games, and this incident occurred during the game. The incident occurred while Wallace was on duty at a place he was required to be. Thus, his conduct occurred within the authorized time and space limits.

■ Third, while the court's decision did not specifically address whether Wallace's conduct was actuated by a purpose to serve UH, the HCRC found that Wallace was at the game to assist the team. Wallace's action was directed at a spectator who was heckling the coach and team, conduct which might reasonably be perceived as interfering with the concentration or morale of the coaches or players. Under the circumstances, it may be concluded that Wallace acted, at least in part, with the purpose of benefitting UH.

---

situation in which, for example, UH is Wallace's employer and Wallace is UH's employee.

29. The dissent postulates that

[e]ven assuming that UH contemplated some kind of contact with spectators, Wallace's conduct . . . was a considerable departure from any usual method of engaging in contact with spectators or quieting the crowd. . . . It is not common, nor would it be expected, that a student manager would yell "Shut up you fucking nigger!" to a spectator of African American descent in an attempt to control a crowd.

Dissent at 325–326, 76 P.3d at 568–569. The infirmity of this argument seems apparent. Consider, hypothetically, a situation in which Wallace was participating in a golf tournament for UH as an official greeter. Consider, further, that he says to one player, "Nice shot" and directs a racial slur at another player. In that instance, under the dissent's analysis, Wallace would be an agent when he complimented one player, but not when he used the racial slur against a second.

Wallace must be considered an agent under both circumstances.

The *Restatement, supra*, § 230, at 511 notes, "[a]n act, although forbidden, or done in a forbidden manner, may be within the scope of employment." Obviously, while the incident presented in this case was unexpected, such a scenario was anticipated by UH, as evidenced by the prohibition in its Handbook against "[u]sing obscene or inappropriate language or gestures to . . . spectators[.]"

Additionally, as the *Restatement* points out, "[s]ince the phrase 'scope of employment,' is used for the conduct of servants, the ultimate question is whether or not it is just that the loss resulting from the servant's acts should be considered as one of the normal risks to be borne by the business[.]" *Restatement, supra*, § 229, cmt. a., at 507. Here, the legislature specifically made it unlawful to discriminate in a public accommodation. It is foreseeable that such discrimination may result from the actions of the servants that work at the public accommodation.

Based upon the foregoing, the court's findings are supported by the record, and the facts support the court's conclusion that Wallace was an agent of UH and, at the time, was acting within the scope of his authority. Therefore, we affirm the court. Our disposition makes it unnecessary to consider Appellees contention that Wallace was an "employee."

IX.

 Appellant further contends that Wallace was acting as a private person, and, as such, his words were protected by the First Amendment. The court held that Wallace was not a private individual and that he was a public agent of UH for purposes of the First Amendment analysis. As previously explained, Wallace was an agent of UH and, hence, was not acting in a private capacity. Wallace did not buy a ticket to attend the basketball game. His purpose for attending the game was to perform his student manager duties. In any event, Wallace's speech was not protected, whether uttered as a public employee or as a private person.

Of course, "a public employee does not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment." *Connick v. Myers*, 461 U.S. 138, 140, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) (citing *Pickering v. Board of Educ.*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)). While *Connick* dealt with employees and not agents, we note no relevant difference for First Amendment analysis purposes. "Whether an [agent's] speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147–48, 103 S.Ct. 1684. Here, no party disputes that Wallace directed the racial slur at Complainant or that the surrounding threatening statements were made. "The question of whether speech touches upon a matter of public concern is one of law, to be reviewed *de novo*." *Dambrot v. Central Michigan Univ.*, 55 F.3d 1177, 1186 (6th Cir.1995) (citing *Rahn v. Drake Ctr.*, 31 F.3d 407, 411 (6th Cir.1994), *cert. denied*, 515 U.S. 1142, 115 S.Ct. 2578, 132 L.Ed.2d 828 (1995); *Barnes*

*v. McDowell*, 848 F.2d 725, 733 (6th Cir. 1988), *cert. denied*, 488 U.S. 1007, 109 S.Ct. 789, 102 L.Ed.2d 780 (1989)). Appellant does not identify any matter of public concern protected by Wallace's speech, and we discern none. *See Dambrot*, 55 F.3d at 1187 (holding a coach's use of the word "nigger" was not "relating to any matter of political, social or other concern to the community"); *Vinci v. Nebraska Dep't of Correctional Servs.*, 253 Neb. 423, 571 N.W.2d 53, 61 (1997) (holding employee's use of "nigger c[*]nt" and "stupid nigger" was not a matter of public concern).

 Assuming, *arguendo*, that Wallace was acting as a private person, Wallace's speech would be characterized as fighting words bereft of First Amendment protection. " 'Whether speech is protected by the first amendment to the United States Constitution, as applied to the states through the due process clause of the fourteenth amendment, is a question of law which is freely reviewable on appeal.' " *In re John Doe, Born on January 5, 1976*, 76 Hawai'i 85, 93, 869 P.2d 1304, 1312 (1994) (quoting *State v. Chung*, 75 Haw. 398, 415, 862 P.2d 1063, 1072 (1993)) (brackets and other citations omitted). We conclude that Wallace's statements, *i.e.*, "Shut up you fucking nigger!" and "[J]ust shut up nigger, or I'll kick your ass!", constituted fighting words. In fact, as noted, the racial slur, which is the subject of HRS chapter 489, was accompanied by threats of violence. This court has held that fighting words are not protected by the First Amendment, and has stated as follows:

There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any constitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or *'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace. Such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.*

*In re John Doe,* 76 Hawai'i at 95, 869 P.2d at 1314 (brackets, ellipsis points, and emphases omitted) (emphasis added) (quoting *Chaplinsky v. New Hampshire,* 315 U.S. 568, 571–72, 62 S.Ct. 766, 86 L.Ed. 1031 (1942) (emphasis added) (footnotes omitted)). Appellant contends violence was not precipitated, but this is of no consequence, as the proper standard is whether the words were *likely to provoke a violent response,* not whether violence occurred. Plainly, there is no requirement that violence must occur, merely that there be a likelihood of violence. It is abundantly clear on the facts of this case that there was a likelihood of violence. *See, e.g., In re Spivey,* 345 N.C. 404, 480 S.E.2d 693, 699 (1997) ("No fact is more generally known than that a white man who calls a black man a 'nigger' within his hearing will hurt and anger the black man and often provoke him to confront the white man and retaliate."); *see also, Taylor v. Metzger,* 152 N.J. 490, 706 A.2d 685, 691 (1998) ("The experience of being called 'nigger,' 'spic,' 'Jap,' or 'kike' is like receiving a slap in the face. The injury is instantaneous." (Quoting Charles R. Lawrence III, *Frontiers of Legal Thought II the New First Amendment: If He Hollers Let Him Go: Regulating Racist Speech on Campus,* 1990 Duke L.J. 431, 452)). For the foregoing reasons, we affirm the court and hold that Wallace's speech was not protected by the First Amendment.

## X.

Accordingly, the court's February 24, 1999 order affirming in part and reversing in part the final decision of the HCRC and its February 26, 1999 final judgment are affirmed.

Dissenting Opinion by NAKAYAMA, J., with whom MOON, C.J., Joins.

Although I find the words used by Wallace in this case reprehensible, I am mindful of my duty to apply the law in a dispassionate manner. Therefore, I must respectfully dissent. The majority concludes, under the theories of express and implied actual authority, that because the handbook expressly gave Wallace authority to perform various duties for the basketball team, he was an agent of UH. In applying the theory of respondeat

superior, the majority then concludes that Wallace was acting within the scope of authority based on Restatement (Second) of Agency § 228 (1958) [hereinafter, "Restatement"]. I disagree with the majority's conclusions, inasmuch as (1) the record does not support a reasonable belief by Wallace that UH desired him, as student manager, to control the crowd at basketball games, and (2) yelling racial slurs at White was not the kind of conduct Wallace was employed to perform.

1. *Wallace was not acting as an agent of UH when he yelled racial slurs at a spectator.*

The majority correctly cites to the following law regarding agency:

An agency relationship may be created through actual or apparent authority. Actual authority exists "only if there has been a manifestation by the principal to the agent that the agent may act on his account and consent by the agent to so act, and may be created by express agreement or implied from the conduct of the parties or surrounding circumstances." Express actual authority requires an oral or written agreement between the parties that the principal has delegated authority that the agent has accepted and that authorizes the agent to do certain acts. Implied actual authority "may arise as a necessary or reasonable implication required to effectuate some other authority expressly conferred by the principal."

*Cho Mark Oriental Food, Ltd. v. K & K Intern.,* 73 Haw. 509, 515–16, 836 P.2d 1057, 1061–62 (1992) (citations and brackets omitted). The majority, however, leaves out the following significant and germane language regarding implied actual authority: Where implied actual authority is asserted, "the focus is on the agent's understanding of his authority inasmuch as the relevant inquiry is 'whether the agent reasonably believes, because of the conduct of the principal (including acquiescence) communicated directly or indirectly to him, that the principal desired him so to act.'" *Id.*

In this case, the majority concludes that because the handbook "expressly gave Wal-

lace authority to perform various duties for the basketball team[,]" he was an agent of UH. It is undisputed, however, that UH did not give Wallace express actual authority to control the crowd at basketball games, as neither the language in the handbook nor any oral agreement provided such authority. As Wallace was not given express actual authority, UH can only be held liable for Wallace's inappropriate racial slurs if Wallace had the implied actual authority to control the crowd at basketball games. Whether this authority existed requires focusing on Wallace's reasonable understanding of his authority—something that the majority fails to address.

In focusing on Wallace's understanding of his authority, there is no possibility that he reasonably believed that UH desired him to control the crowd at basketball games. Wallace's "job description" as a student manager provided that he was to do the following during regular season [1]:

1. Issue practice uniforms and other gear for season practices
2. Keep a log of all issued equipment
3. Sweep all floors two hours before practice time
4. Be ready to assist players one hour before practice
5. Set-up the arena or the gym with water and other equipment
6. Work with various drills during practice
7. Keep all players' equipment in proper working order during practice
8. Keep the water filled and ready to be served
9. Keep the floors dry of sweat and other water
10. Keep the locker room clean throughout the year
11. Set-up gym for the visiting teams
12. Work with all visiting teams during their practices
13. Help the visiting teams' managers with their laundry
14. Set-up locker rooms in the arena on game day
15. Set-up equipment for both teams on game day
16. Work on the bench during the game
17. Keep the players' equipment in working order at half time
18. Give the players water and oranges at half time
19. Give the visiting team their copy of the game (VHS)
20. Pack the travel bags for the players containing their equipment for road trips
21. Travel with the team on road trips to other schools, usually six days
22. Make all wake-up calls
23. Put away all equipment upon arrival in Honolulu and prepare it for the next practice
24. Work with the equipment room manager on designated tasks

Wallace's express authority to "[w]ork on the bench during the game" does not require, as a necessary and reasonable implication, that Wallace control the crowd at basketball games. It is clear, from these job descriptions, that Wallace was to focus his attention "on the bench" at the players, in making sure

---

1. Regular season, according to Wallace's job description, was from October 15th-March 14th. This incident occurred during regular season on February 18, 1995. During pre-season, which was from August–October 14th, Wallace's job description provided him with the following duties:
 1. Basketball committee golf tournament—help with set-up and work different stations
 2. Issue equipment for preseason workouts, including running shoes
 3. Keep a record of all equipment
 4. Sweep floors for workouts, one hour before start time
 5. Prepare water and essential equipment for workouts
 6. Be present at every practice
 7. Be present at least one hour before and one hour after workouts

 Any express authority to assist with the golf fundraiser, and consequently, any implied authority to interact with the public at the fundraiser, was limited to pre-season. The record does not support a reasonable inference of any crossover of this authority into regular season game time duties to control the crowd at basketball games.

their technical needs were met. It is not reasonable to believe that this extends to getting "off the bench" to control the conduct of the crowd. Furthermore, it is apparent that Wallace understood that authority to control the crowd lay outside his authority, inasmuch as he initially notified the arena manager so that the arena manager could control White's comments. As the record is not supportive of any reasonable belief by Wallace that UH desired him to control the crowd at basketball games, Wallace did not have implied actual authority to do so. Accordingly, I would hold that Wallace was not an agent of UH at the time he yelled racial slurs at White.

2. *Wallace was not acting within the scope of authority when he yelled racial slurs at a spectator.*

In applying the theory of respondeat superior to the present case, the majority cites to Restatement § 228, which provides in relevant part:

(1) Conduct of a servant is within the scope of employment if, but only if:

(a) it is of the kind he is employed to perform;

(b) it occurs substantially within the authorized time and space limits;

(c) it is actuated, at least in part, by a purpose to serve the master, and

(d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.

(2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.

The majority then concludes that Wallace was acting within the scope of authority because his action of yelling racial slurs at a spectator was the kind he was authorized to perform.[2] For support, the majority points to the handbook and concludes that UH envisioned public interaction during basketball games. I respectfully disagree, inasmuch as Wallace's yelling racial slurs was a considera-

ble departure from the kind of conduct that UH authorized him to perform.

Restatement § 229, which defines when conduct is of the kind within the scope of employment, generally provides that "[t]o be within the scope of employment, conduct must be of the same general nature as that authorized, or incidental to the conduct authorized." Thus, "a servant is authorized to do anything which is reasonably regarded as incidental to the work specifically directed or which is usually done in connection with such work." Restatement § 229 comment a; *see also* Restatement § 230 comment c ("Conduct is not within the scope of employment if it has no connection with the act which the employee is required to perform."); *Osborne v. Lyles*, 63 Ohio St.3d 326, 587 N.E.2d 825, 829 (1992) ("In general, 'an intentional and wilful attack committed by an agent or employee, to vent his own spleen or malevolence against the injured person, is a clear departure from his employment and his principal or employer is not responsible therefor.'") (Citation omitted.).

With respect to unauthorized incidental conduct, Restatement § 229 provides:

(2) In determining whether or not the conduct, although not authorized, is nevertheless so similar to or incidental to the conduct authorized as to be within the scope of employment, the following matters of fact are to be considered:

(a) whether or not the act is one commonly done by such servants;

(b) the time, place and purpose of the act;

(c) the previous relations between the master and the servant;

(d) the extent to which the business of the master is apportioned between different servants;

(e) whether or not the act is outside the enterprise of the master or, if within the enterprise, has not been entrusted to any servant;

(f) whether or not the master has reason to expect that such an act will be done;

---

2. The majority's conclusion that Wallace's yelling racial slurs occurred within authorized time and space limits is not addressed, inasmuch as there

is no dispute that Wallace, as a student manager, was required to attend basketball games and that this incident occurred during a basketball game.

(g) the similarity in quality of the act done to the act authorized;

(h) whether or not the instrumentality by which the harm is done has been furnished by the master to the servant;

(i) the extent of departure from the normal method of accomplishing an authorized result; and

(j) whether or not the act is seriously criminal.

Comments to Restatement § 229 indicate that "[a]lthough an act is a means of accomplishing an authorized result, it may be done in so outrageous or whimsical a manner that it is not within the scope of employment." Restatement § 229 comment b; *see also* Restatement § 235 comment c ("The fact that an act is done in an outrageous or abnormal manner has value in indicating that the servant is not actuated by an intent to perform the employer's business."); Restatement § 245 comment f ("The fact that the servant acts in an outrageous manner or inflicts a punishment out of all proportion to the necessities of his master's business is evidence indicating that the servant has departed from the scope of employment in performing the act."); *Grozdanich v. Leisure Hills Health Center, Inc.*, 25 F.Supp.2d 953, 979 (D.Minn. 1998) ("Naturally, the more outrageous the employee's tortious act should be, the less likely it could be described as foreseeable, and the less likely that the employer could be required to assume responsibility for the act, as a general risk of the employer's business."); *Luna v. Meinke*, 844 F.Supp. 1284, 1287–88 (N.D.Ill.1994) ("An agent ... is deemed to have acted outside the scope of his or her employment if the employee commits certain acts 'that could not possibly be interpreted as the merely overzealous or ill-judged performance of his duties as agent.'") (Citation omitted.); *Sawyer v. Humphries*, 322 Md. 247, 587 A.2d 467, 471 (1991) (" '[W]here the conduct of the servant is unprovoked, highly unusual, and quite outrageous,' courts tend to hold 'that this in itself is sufficient to indicate that the motive was a purely personal one' and the conduct outside the scope of employment.") (Citations omitted.); *Bryant v. Brannen*, 180 Mich.App. 87,

446 N.W.2d 847, 855 (1989) (holding that a building manager's outrageous conduct in shooting a tenant was not within the scope of employment, despite the manager's authority to protect the building); *Bates v. Doria*, 150 Ill.App.3d 1025, 104 Ill.Dec. 191, 502 N.E.2d 454, 457 (1986) (holding that a sheriff's outrageous conduct of shooting and raping the plaintiff was outside the scope of employment).

In *Atlanta Baseball Co. v. Lawrence*, 38 Ga.App. 497, 144 S.E. 351, 352 (1928), the court was faced with whether a professional baseball company could be held liable under the theory of respondeat superior for the actions of a pitcher it employed. In that case, several spectators began heckling the pitcher at a game, whom they felt was responsible for the poor showing of the team. *Id.* at 351. One of the spectators in particular said, "Give us another pitcher." *Id.* Thereafter, the pitcher left the field during the game and proceeded to attack the spectator. *Id.* In analyzing the issue of respondeat superior, the court stated,

> The conduct of [the pitcher] in leaving his place upon the grounds and coming into the grandstand, and assaulting the plaintiff, was not within the scope of his employment, nor in the prosecution of his master's business, but was his own personal affair in resenting a real or fancied insult. "If a servant steps aside from his master's business, for however short a time, to do an act entirely disconnected from it, and injury results to another from such independent voluntary act, the servant may be held liable, but the master is not liable."

*Id.* at 352 (citations omitted). The court noted the unusualness of such a sudden outburst and concluded that the baseball company could not be held liable under the theory of respondeat superior. *Id.*

Based on the considerations in Restatement § 229, which must be read in conjunction with Restatement § 228, as well as the outrageousness of such action, Wallace's yelling racial slurs was not the kind of conduct that UH authorized him to perform.[3] As

3. Under the considerations outlined in Restatement § 229, the hypothetical presented by the

previously discussed, Wallace was not authorized, either expressly or impliedly, to control the crowd at basketball games. Instead, this authority was entrusted to the arena manager. As such, Wallace's conduct in yelling racial slurs at White, to vent his own anger, was not incidental to or even remotely connected to his duties as student manager. Even assuming that UH contemplated some kind of contact with spectators, Wallace's conduct, similar to that in *Atlanta Baseball Co.*, was a considerable departure from any usual method of engaging in contact with spectators or quieting the crowd. After hearing White's heckling for most of the game, Wallace got "off the bench," "lost it," and yelled, "Shut up you fucking nigger! I'm tired of hearing your shit! Shut your mouth or I'll kick your ass!" It is not common, nor would it be expected, that a student manager would yell "Shut up you fucking nigger!" to a spectator of African American descent in an attempt to control a crowd. Accordingly, I would hold that Wallace's conduct in yelling racial slurs was not of the kind he was authorized to perform. For these reasons, I respectfully dissent.

majority in footnote 29 is not germane.