SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court. In the interest of brevity, portions of an opinion may not have been summarized.

**Armando Rios, Jr. v. Meda Pharmaceutical, Inc. (A-23-20) (084746)**

**Argued March 31, 2021 -- Decided June 16, 2021**

**RABNER, C.J., writing for a unanimous Court.**

In this appeal, the Court considers whether a supervisor's use of two offensive slurs could support a hostile work environment claim. The key question is whether the alleged slurs, directed at a Hispanic employee, were severe or pervasive enough for the claim to survive summary judgment and proceed to trial.

Plaintiff Armando Rios, Jr. a Hispanic male, was hired by defendant Meda Pharmaceutical, Inc. (Meda) in May 2015. Defendant Tina Cheng-Avery was Rios's direct supervisor. Rios asserts that Cheng-Avery twice directed the ugly term "Sp--" toward him at their place of work. Rios says he reported her comments to Meda's Director of Human Resources after each incident. Cheng-Avery placed Rios on probation in February 2016 for poor performance. Meda fired Rios in June 2016.

Rios filed a complaint alleging in part that defendants violated the Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49, by creating a hostile work environment. The trial court granted defendants' motion for summary judgment, finding that no rational factfinder could conclude Cheng-Avery's alleged comments were sufficiently severe or pervasive to create a hostile work environment. The Appellate Division affirmed. The Court granted certification. 244 N.J. 428 (2020).

**HELD:** At a motion for summary judgment, courts view the evidence in a light most favorable to the non-moving party -- in this case, Rios. And the Court considers the remarks from the perspective of a reasonable Hispanic employee in Rios's position. Under all the circumstances, a rational jury could conclude the demeaning and contemptuous slurs, allegedly uttered by a direct supervisor, were sufficiently severe or pervasive to create a hostile work environment in violation of the LAD.

1. Under the LAD, it is unlawful for employers to discriminate in their employment practices based on any of the enumerated grounds. N.J.S.A. 10:5-12(a). In the statute itself, the Legislature declared that "discrimination threatens not only the rights and proper privileges of the inhabitants of the State but menaces the institutions and foundation of a free democratic State." N.J.S.A. 10:5-3. (pp. 8-9)

1

2. The Court outlined the elements of a hostile work environment claim under the LAD in Lehmann v. Toys 'R' Us, in which the plaintiff based her claim on a supervisor's acts of alleged sexual harassment. 132 N.J. 587, 595-99 (1993). The Court held that a plaintiff must allege that "the complained-of conduct (1) would not have occurred but for the employee's gender; and it was (2) severe or pervasive enough to make a (3) reasonable woman believe that (4) the conditions of employment are altered and the working environment is hostile or abusive." Id. at 603-04. The Lehmann standard applies generally to hostile work environment claims, including claims based on racial comments. Such claims must be evaluated in light of all the circumstances. (pp. 9-10)

3. The second element of the claim -- whether the conduct was sufficiently severe or pervasive -- is critical here. This element, as well, must be measured by the surrounding circumstances. In most cases, it is the cumulative impact of separate successive incidents that cements the hostile work environment. However, in rare and extreme cases, a single incident can also create a hostile work environment. In the case of a racial epithet, its connotation can materially contribute to the remark's severity. And the severity of a remark can be exacerbated when it is uttered by a supervisor. (pp. 11-12)

4. Settled case law relies on an objective standard to evaluate a hostile work environment claim. Thus, for a hostile work environment claim based on offensive comments directed to a Hispanic employee, the remarks must be viewed from the perspective of a reasonable Hispanic person in the plaintiff's position. (pp. 12-13)

5. Here, the two comments Cheng-Avery allegedly made were highly offensive and demeaning slurs from the perspective of an objectively reasonable Hispanic person. Second, Cheng-Avery's position as a supervisor compounded the severity of the alleged remarks. Third, Rios states that he reported the alleged slurs consistent with company policy. If true, Rios gave the company an opportunity to remedy the situation, and nothing happened. Viewed in context, a reasonable Hispanic employee could believe the comments portrayed an attitude of prejudice that injected hostility and abuse into the working environment and significantly altered the conditions of his employment. In other words, a rational factfinder could conclude the alleged conduct was sufficiently severe or pervasive to create a hostile work environment. The Court explains why Taylor v. Metzger, 152 N.J. 490 (1998), does not call for a different result. (pp. 14-19)

6. The Court finds only that the conduct Rios alleges presents sufficient evidence of severity to create a genuine issue of material fact and call for a trial on the merits. The Court makes no finding about whether Cheng-Avery made the statements attributed to her and offers no opinion on the outcome of the case. (pp. 19-20)

   **REVERSED and REMANDED for trial.**

**JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ-VINA, SOLOMON, and PIERRE-LOUIS join in CHIEF JUSTICE RABNER's opinion.**

2

SUPREME COURT OF NEW JERSEY

A-23 September Term 2020

084746

Armando Rios, Jr.,

Plaintiff-Appellant,

v.

Meda Pharmaceutical, Inc.,
Tina Cheng-Avery, and
Glenn Gnirrep,

Defendants-Respondents,

and

Mylan Inc.,

Defendant.

On certification to the Superior Court,
Appellate Division.

| Argued | Decided |
|--------|---------|
| March 31, 2021 | June 16, 2021 |

William R. Stoltz argued the cause for appellant (Law
Offices Rosemarie Arnold, attorneys; William R. Stoltz
and Maria Luppino, on the briefs).

Marina C. Tsatalis, of the New York bar, admitted pro
hoc vice, argued the cause for respondents (Saiber and
Wilson Sonsini Goodrich & Rosati, attorneys; Marina C.
Tsatalis and John M. Losinger, on the briefs).

1

Deborah L. Mains argued the cause for amicus curiae New Jersey Association for Justice (Costello & Mains, attorneys; Deborah L. Mains, on the brief).

CHIEF JUSTICE RABNER delivered the opinion of the Court.

In this appeal, the Court considers whether a supervisor's use of two offensive slurs could support a hostile work environment claim. The key question is whether the alleged slurs, directed at a Hispanic employee, were severe or pervasive enough for the claim to survive summary judgment and proceed to trial. The trial court and Appellate Division found they were not and granted summary judgment for defendants. We do not agree.

Plaintiff Armando Rios, Jr. asserts that his supervisor, defendant Tina Cheng-Avery, directed ugly slurs toward him at their place of work. According to Rios, during a conversation with Cheng-Avery about his plan to buy a new house, she said "it must be hard for a Spic[1] to have to get FHA loans." A month later, Rios says Cheng-Avery commented that an actress auditioning for a company commercial "would work if she didn't look too Spicky." Cheng-Avery denies making both statements.

---

[1] We use the offensive language in the record because it bears directly on the issue this appeal presents. We mean no disrespect.

At this stage of the case, we view the evidence in a light most favorable to the plaintiff. We also consider the remarks from the perspective of a reasonable Hispanic employee in Rios's position. Under all of the circumstances, we find that a rational jury could conclude the demeaning and contemptuous slurs, allegedly uttered by a direct supervisor, were sufficiently severe or pervasive to create a hostile work environment in violation of the Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49. We therefore reverse and remand the case for trial.

I.

We draw the following facts from the summary judgment record.

Rios, a Hispanic male, was hired by defendant Meda Pharmaceutical, Inc. (Meda) in May 2015 as the company's Director of Brand Marketing. Cheng-Avery and other executives interviewed Rios. Cheng-Avery, the Senior Director of Commercial Operations, was Rios's direct supervisor.

Rios asserts that, one month after he started working at Meda, he told Cheng-Avery that he and his wife were looking for a new home. Rios and Cheng-Avery were alone together in her office. According to Rios, Cheng-Avery replied, "it must be hard for a Sp-- to have to get FHA[2] loans." Rios said he paraphrased Cheng-Avery's words.

---

[2] Federal Housing Administration.

3

Several weeks later, in July 2015, Rios alleges Cheng-Avery made a second comment while the two were casting actresses for a television commercial for a Meda product. According to Rios, Cheng-Avery told him one of the actresses "would work" for the commercial "if she didn't look too Sp--ky."

Cheng-Avery denies making either statement.

Rios says he met with Glenn Gnirrep, Meda's Director of Human Resources, after each incident and reported Cheng-Avery's comments. According to Rios, Gnirrep was dismissive and did not take any notes. Gnirrep passed away in 2018 and was not deposed in this matter.

Meda had an Equal Employment Opportunity Policy and Complaint Procedure in place at the time Rios worked there. For employees who believed they may have been discriminated against, the company's policy provided as follows: "[Y]ou should report the alleged violation immediately to your direct Manager, any other Manager, a Human Resources Professional and/or an attorney in Meda's Legal Department. Please speak with whichever person you feel the most comfortable, whatever your reasons." Rios claims he followed the policy by meeting with Gnirrep. He said he did not submit a written complaint because he feared retaliation.

4

Cheng-Avery placed Rios on probation in February 2016 for poor performance. The following month, he was placed on a performance improvement plan. Under the plan, he met weekly with Cheng-Avery and received generally unfavorable written assessments. Meda fired Rios on June 1, 2016. Cheng-Avery certified that her decision to fire Rios was based on his "poor performance" and "had nothing to do with his national origin[] or gender."

Rios filed a complaint on March 31, 2017, and an amended complaint three weeks later. The amended complaint names Meda, Cheng-Avery, and Gnirrep as defendants.[3] Count one alleges that defendants violated the LAD by creating a hostile work environment for Rios. The remaining counts are not relevant to this appeal.[4] Rios points to Cheng-Avery's two comments as "[e]xamples of the ongoing and severe daily harassment and . . . national origin discrimination perpetuated by" Cheng-Avery.

_____

[3] Mylan, Inc. acquired Meda months after Rios was fired. Mylan was named as a defendant and later voluntarily dismissed by the parties.

[4] The remaining counts assert LAD claims for failure to investigate and have effective anti-discrimination and anti-harassment policies and procedures in place; a claim under the Conscientious Employee Protection Act, N.J.S.A. 34:19-1 to -8; and a claim that defendants caused Rios severe emotional distress. This appeal is limited to the factual assertions and legal issues tied to Rios's hostile work environment claim based on national origin.

On March 20, 2019, the trial court granted defendants' motion for summary judgment on all counts. As to count one, the court found that no rational factfinder could conclude Cheng-Avery's alleged comments were sufficiently severe or pervasive to create a hostile work environment. The court also noted that "[t]he undisputed facts" were "materially and substantially different" from what occurred in Taylor v. Metzger, 152 N.J. 490 (1998), which is discussed below.

The Appellate Division affirmed. The court acknowledged that "[t]he word 'sp--' is a national origin epithet" that "even if only uttered twice, could have met the severity requirement" and "sustain[ed] a hostile [work] environment claim." But the appellate court focused on the absence of evidence that Rios faced adverse employment consequences because of his complaints about Cheng-Avery's comments, and on the lack of corroboration for his testimony.

We granted Rios's petition for certification. 244 N.J. 428 (2020). We also granted leave to the New Jersey Association for Justice (NJAJ) to appear as amicus curiae.

## II.

Rios argues that summary judgment was inappropriate because Cheng-Avery's use of "multiple racial slurs specifically directed at" him was

6

sufficiently severe or pervasive to support a claim for a hostile work environment.  He stresses that Cheng-Avery made the comments in her role as his supervisor and argues that the principles outlined in <u>Taylor</u> apply directly here.

The NJAJ, as amicus, echoes Rios's arguments and submits the evidence in the record is sufficient to allow a reasonable jury to conclude that Rios "was the victim of race/national origin harassment" under the LAD.  Rios and the NJAJ also caution against conflating the elements of a harassment claim with a disparate treatment or retaliation claim.

Defendants counter that the Appellate Division applied <u>Taylor</u> to the facts of this case and correctly concluded there were no disputed facts that could establish Rios's treatment was severe enough to support a hostile work environment claim.  Defendants add that <u>Taylor</u> should not be extended to the point "that any racial slur uttered in the workplace automatically creates liability for a hostile work environment."  Defendants also emphasize certain alleged weaknesses in Rios's claim, including that Cheng-Avery was not a high-level executive at Meda; that her comments were not made in the presence of others and cannot be corroborated; and that a key witness, Gnirrep, died before he was deposed.

7

III.

Rios brought his claim under the LAD.  Its goal is "nothing less than the eradication of the cancer of discrimination."  Raspa v. Off. of Sheriff of Gloucester, 191 N.J. 323, 335 (2007) (quoting Fuchilla v. Layman, 109 N.J. 319, 334 (1988)).

The LAD prohibits discrimination based on

> race, creed, color, national origin, ancestry, age, marital status, civil union status, domestic partnership status, affectional or sexual orientation, genetic information, pregnancy or breastfeeding, sex, gender identity or expression, disability or atypical hereditary cellular or blood trait of any individual, or because of the liability for service in the Armed Forces of the United States or the nationality of any individual, or because of the refusal to submit to a genetic test or make available the results of a genetic test to an employer.
>
> [N.J.S.A. 10:5-12(a).]

Based on any of the above grounds, it is "an unlawful employment practice" or "unlawful discrimination" for an employer "to refuse to hire or employ," "to discharge or require to retire," or "to discriminate . . . in compensation or in terms, conditions or privileges of employment."  Ibid.

In the statute itself, the Legislature declared that "discrimination threatens not only the rights and proper privileges of the inhabitants of the State but menaces the institutions and foundation of a free democratic State."  N.J.S.A. 10:5-3.  The statute also recognizes as a civil right "the opportunity to

8

obtain employment." N.J.S.A. 10:5-4. The law is thus intended to protect "the civil rights of individual aggrieved employees" as well as "the public's strong interest in a discrimination-free workplace." Lehmann v. Toys 'R' Us, 132 N.J. 587, 600 (1993) (citing Fuchilla, 109 N.J. at 335); see also Alexander v. Seton Hall Univ., 204 N.J. 219, 227-28 (2010); Nini v. Mercer Cnty. Cmty. Coll., 202 N.J. 98, 106-07 (2010).

The LAD is remedial legislation that should be liberally construed to advance its purposes. Smith v. Millville Rescue Squad, 225 N.J. 373, 390 (2016); N.J.S.A. 10:5-3.

This Court outlined the elements of a hostile work environment claim under the LAD in Lehmann. 132 N.J. at 603-04. In that groundbreaking case, the plaintiff based her cause of action on a supervisor's acts of alleged sexual harassment. Id. at 595-99. To state a claim, the Court held that a plaintiff must allege that "the complained-of conduct (1) would not have occurred but for the employee's gender; and it was (2) severe or pervasive enough to make a (3) reasonable woman believe that (4) the conditions of employment are altered and the working environment is hostile or abusive." Id. at 603-04.[5]

---

[5] To the extent that part of the Appellate Division's decision can be read to suggest plaintiffs must offer proof of an adverse employment action or retaliation to establish a hostile work environment claim, we do not agree. See Taylor, 152 N.J. at 505 ("The test of severity adopted by this Court in Lehmann does not in all cases require evidence of an actual change in working

9

The test's second, third, and fourth prongs "are interdependent." Id. at 604. As the Court explained, "[o]ne cannot inquire whether the alleged conduct was 'severe or pervasive' without knowing how severe or pervasive it must be." Ibid. And "[t]he answer to that question lies in the other prongs: the conduct must be severe or pervasive enough to make a reasonable woman believe that the conditions of employment are altered and her working environment is hostile." Ibid.

The Lehmann standard applies generally to hostile work environment claims, including claims based on racial comments. See Taylor, 152 N.J. at 498-500; see also Cutler v. Dorn, 196 N.J. 419, 436-38 (2008) (hostile work environment claim based on religion and ancestry). Any such claims must be evaluated in light of "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Cutler, 196 N.J. at 432 (quotation marks omitted) (quoting Green v. Jersey City Bd. of Educ., 177 N.J. 434, 447 (2003)).

---

conditions in order for there to be a hostile work environment."); Lehmann, 132 N.J. at 610 ("Because discrimination itself is the harm that the LAD seeks to eradicate, additional harms need not be shown in order to state a claim under the LAD.").

10

The second element of the claim -- whether the conduct was sufficiently severe or pervasive -- is critical to this appeal. This element, as well, must be "measured by [the] surrounding circumstances." Taylor, 152 N.J. at 506; Cutler, 196 N.J. at 431. Among other things, "courts must consider the cumulative effect of the various incidents, bearing in mind 'that each successive episode has its predecessors, that the impact of the separate incidents may accumulate, and that the work environment created may exceed the sum of the individual episodes.'" Lehmann, 132 N.J. at 607 (quoting Burns v. McGregor Elec. Indus., Inc., 955 F.2d 559, 564 (8th Cir. 1992)); see Cutler, 196 N.J. at 432 ("In most cases, it is the cumulative impact of separate successive incidents that cements the hostile work environment."). However, in rare and extreme cases, a single incident can also create a hostile work environment. Taylor, 152 N.J. at 499-501; Lehmann, 132 N.J. at 606-07.

In the case of a racial epithet, its "connotation . . . can materially contribute to the remark's severity." Taylor, 152 N.J. at 502. As the Court noted in Taylor, an egregious epithet -- "an unambiguously demeaning racial message" or an "ugly, stark and raw" racist slur -- can be sufficiently severe to establish a claim even if used only once. Id. at 502-03.

In addition, the severity of a remark can be "exacerbated" when it is uttered by a supervisor. Id. at 503. Supervisors have an important "role in

11

shaping the work environment." Ibid. They should prevent, not create, a hostile atmosphere. For that reason, invidious harassment by a supervisor can have a greater impact than misconduct by fellow employees. See id. at 504 (citing Rodgers v. W.-S. Life Ins. Co., 12 F.3d 668, 675 (7th Cir. 1993)).

In the context of conduct that may give rise to vicarious liability for a hostile work environment, an "expansive definition of 'supervisor'" applies. Aguas v. State, 220 N.J. 494, 528-29 (2015) (claim based on sexual harassment); see Lehmann, 132 N.J. at 619-20 (same). That approach draws attention to individuals who "direct the day-to-day responsibilities of subordinates" as well as higher-level management. Aguas, 220 N.J. at 528-29.

Settled case law relies on an objective standard to evaluate a hostile work environment claim. Cutler, 196 N.J. at 431; Taylor, 152 N.J. at 506; Lehmann, 132 N.J. at 604, 611-14. The standard focuses on the harassing conduct itself and "not its effect on the plaintiff or on the work environment." Lehmann, 132 N.J. at 606 (citing Ellison v. Brady, 924 F.2d 872, 878 (9th Cir. 1991)); see id. at 612 (noting that "the reaction of the individual plaintiff is more relevant to damages" than to the legality of the conduct); Cutler, 196 N.J. at 431 ("[N]either a plaintiff's subjective response to the harassment, nor a defendant's subjective intent when perpetrating the harassment [controls]."

(quotations omitted)). The approach is therefore consistent with the LAD's goal: to eliminate the discriminatory behavior. Lehmann, 132 N.J. at 612.

Lehmann also points out that "an objective standard provides flexibility." Ibid. In a prescient passage, the Court noted in 1993 that "much conduct that would have been considered acceptable twenty or thirty years ago would be considered sexual harassment today. As community standards evolve, the standard of what a reasonable [person] would consider harassment will also evolve." Ibid. That holds true today as well.

Thus, for a hostile work environment claim based on offensive comments directed to a Hispanic employee, the remarks must be viewed from the perspective of a reasonable Hispanic person in the plaintiff's position.

## IV.

## A.

The trial court dismissed Rios's claim on summary judgment. We review that decision de novo and apply the same standard as the trial court. Woytas v. Greenwood Tree Experts, Inc., 237 N.J. 501, 511 (2019).

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R.

13

4:46-2(c); see Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 528-29 (1995). "To decide whether a genuine issue of material fact exists, the trial court must 'draw[] all legitimate inferences from the facts in favor of the non-moving party.'" Friedman v. Martinez, 242 N.J. 449, 472 (2020) (alteration in original) (quoting Globe Motor Co. v. Igdalev, 225 N.J. 469, 480 (2016)). The court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Brill, 142 N.J. at 540 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)).

If "the evidence 'is so one-sided that one party must prevail as a matter of law,'" summary judgment is proper. Petro-Lubricant Testing Labs., Inc. v. Adelman, 233 N.J. 236, 257 (2018) (quoting Brill, 142 N.J. at 540). But summary judgment "is not meant 'to shut a deserving litigant from his [or her] trial.'" Friedman, 242 N.J. at 472 (alteration in original) (quoting Brill, 142 N.J. at 540).

### B.

We assess Rios's claim under that standard and conclude that summary judgment should not have been granted against him. Under all of the circumstances, a rational factfinder could have reasonably found from Rios's evidence that the alleged slurs directed at him were sufficiently severe to

14

create a hostile work environment. He should therefore be allowed to present his claim to a jury.

A number of considerations lead to that result. First, the two comments Cheng-Avery allegedly made were highly offensive and demeaning slurs from the perspective of an objectively reasonable Hispanic person. The first comment was directed at Rios. In the context of him telling Cheng-Avery that he and his wife were looking to buy a home, Cheng-Avery allegedly responded that "it must be hard for a Sp-- to have to get FHA loans."

The language allegedly spoken has no place in a work setting. The term "sp--" is "a derogatory word for Mexicans, Mexican Americans, and Puerto Ricans" that has also "expanded to encompass other Hispanic groups, including Central Americans, South Americans, and Caribbeans." Richard Delgado & Jean Stefancic, Understanding Words That Wound 56 (2018). The word "embod[ies] a history of disdain toward . . . Latinos." Id. at 59. And its highly insulting nature is widely recognized. See, e.g., Alamo v. Bliss, 864 F.3d 541, 550 (7th Cir. 2017) (recognizing "sp--" as a "severe" racial slur that "evinces a clear animus against a particular national origin"); Cerros v. Steel Techs., Inc., 398 F.3d 944, 950-51 (7th Cir. 2005) (finding "it difficult to imagine epithets more offensive to someone of Hispanic descent" than "sp--" and other words used in the case); see also KB Enters., LLC v. Mont. Human

15

Rights Comm'n, 443 P.3d 498, 503 (Mont. 2019) ("The experience of being called . . . 'sp--' . . . is like receiving a slap in the face.  The injury is instantaneous."  (quoting State v. Hoshijo, 76 P.3d 550, 565 (Haw. 2003))); Richard Delgado, Words That Wound:  A Tort Action for Racial Insults, Epithets, and Name-Calling, 17 Harv. C.R.-C.L. L. Rev. 133, 145 (1982) ("Most people today know that certain words are offensive and only calculated to wound.  No other use remains for . . . words [such] as . . . 'sp---' . . . ."); id. at 174 ("Words such as . . . 'sp---' are badges of degradation even when used between friends; these words have no other connotation.").[6]

The second alleged comment conveyed a more indirect but equally troubling message.  Cheng-Avery allegedly told Rios that a particular actress "would work" for a commercial for the company "if she didn't look too Sp--ky."[7]  Embedded in the comment is the notion that people of a certain national origin or race cannot represent or serve as the public face of the company, that people -- like Rios -- do not have the "right" look.  Although the

---

[6] Rios describes himself as a Hispanic male.  He and other sources alternatively refer to the term "sp--" as a derogatory racial or ethnic slur, or an abusive word directed toward a person's national origin.  However the slur is categorized, it is widely recognized as an offensive epithet in any context.

[7] Cheng-Avery denied making the comment.  In her deposition, she stated the company wanted a Caucasian actress to reach the target audience.  On a motion for summary judgment, we consider the evidence in the light most favorable to Rios, the non-moving party.  Friedman, 242 N.J. at 472.

statement was not about Rios, it was directed at him. In any event, a "plaintiff's work environment is affected not only by conduct directed at [himself] but also by the treatment of others." Lehmann, 132 N.J. at 611.

Second, Cheng-Avery's position as a supervisor compounded the severity of the alleged remarks. Taylor emphasized the overarching responsibilities of a supervisor to prevent and put an end to racial harassment in the workplace. 152 N.J. at 503-05. Direct supervisors also routinely work closely with employees they supervise and evaluate their performance. In that and other ways, a person's direct supervisor often has a say in the individual's future with the organization -- even if the supervisor is not a top-ranking official. Here, Cheng-Avery had interviewed Rios for his position with the company only weeks before the alleged comments were made.

Under those circumstances, comments like the ones alleged, viewed from the perspective of a reasonable Hispanic employee, could taint every interaction that followed between an employee and a direct supervisor.

Third, Rios states that he reported the alleged slurs in a manner consistent with company policy. He says he met with the head of Human Resources and relayed the offensive remarks. According to Rios, the person was "dismissive" and took no action. If true, Rios gave the company an opportunity to remedy the situation, and nothing happened.

17

Viewed in context, a reasonable Hispanic employee could believe the comments "portray[ed] an attitude of prejudice that inject[ed] hostility and abuse into the working environment and significantly alter[ed] the conditions of [his] employment." See id. at 506. In other words, a rational factfinder could conclude the alleged conduct was sufficiently severe or pervasive to create a hostile work environment. Rios's claim, as a result, was entitled to survive summary judgment and proceed to a jury.

Defendants argue that the facts asserted do not rise to the level of severity in Taylor and therefore can be resolved without a trial. In that case, Carrie Taylor, a Black sheriff's officer, greeted the sheriff at the police academy. Id. at 495. In response, the sheriff turned to the undersheriff and said "[t]here's the jungle bunny." Ibid. The undersheriff laughed at the remark, as did Taylor's fellow officers when she later told them what happened. Id. at 495-96. Days later, when Taylor asked for an apology, the sheriff "badgered [her] for interpreting the remark as a racial slur and brought her to tears." Id. at 496. He later "hassled her for rejecting" a written apology, which she claimed included inaccurate facts. Ibid.

The Taylor Court found that a rational factfinder could conclude that the single racial epithet "was sufficiently severe to contribute materially to the creation of a hostile work environment." Id. at 502. Under the circumstances,

18

the Court reversed the grant of summary judgment and remanded the case for trial. Id. at 508.

The facts of Taylor differ in a number of ways from the record in this case. The sheriff was Taylor's chief ranking supervisor and the head of the office, leaving her no path to seek redress, and he uttered the racial slur in the presence of another high-level officer who laughed, as did her co-workers. But the Taylor Court did not establish a floor or set minimal factual requirements for a hostile work environment claim. The Court instead applied an analytical framework to assess the relevant facts, as it did before in Lehmann, 132 N.J. at 604-15, and in multiple cases since, see, e.g., Cutler, 196 N.J. at 430-40; Godfrey v. Princeton Theological Seminary, 196 N.J. 178, 196-203 (2008); Shepherd v. Hunterdon Developmental Ctr., 174 N.J. 1, 24-26 (2002). We follow the same approach here -- guided by principles of law but not bound by the particular facts of prior cases.

Defendants note there is nothing in the record to corroborate Rios's allegations and that Rios allegedly reported them to a witness who is now deceased. Those arguments are for a jury to consider. At a motion for summary judgment, courts view the evidence in a light most favorable to the non-moving party -- in this case, Rios. See Friedman, 242 N.J. at 472. We find only that the conduct he alleges presents sufficient evidence of severity to

19

create a genuine issue of material fact and call for a trial on the merits. We make no finding about whether Cheng-Avery made the statements attributed to her and offer no opinion on the outcome of the case.

V.

For the reasons set forth above, we reverse the judgment of the Appellate Division and remand for further proceedings.

JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ-VINA, SOLOMON, and PIERRE-LOUIS join in CHIEF JUSTICE RABNER's opinion.